No. 23-2835

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

CHARLES BOYD OLSON and JANINE OLSON,

Plaintiffs-Appellants,

v.

UNISON AGREEMENT CORPORATION,

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Western District of Washington
Case No. 2:22-cv-01859-RAJ
The Honorable Richard A. Jones

---

## ANSWERING BRIEF OF
## DEFENDANT-APPELLEE UNISON
## AGREEMENT CORPORATION

---

Brent Caslin
Kelly M. Morrison
JENNER & BLOCK LLP
515 S. Flower St., Ste. 3300
Los Angeles, CA 90071
Tel: 213-239-5100
bcaslin@jenner.com
kmorrison@jenner.com

Jeremy M. Creelan
Joseph L. Noga
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel: 212-891-1600
jcreelan@jenner.com
jnoga@jenner.com

*Counsel for Defendant-Appellee Unison Agreement Corporation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure Rule 26.1, Defendant-Appellee Unison Agreement Corporation certifies that it is a wholly owned subsidiary of Real Estate Equity Exchange, Inc. No publicly held corporation owns 10% or more of Unison Agreement Corporation's stock.

Dated: April 26, 2024

Respectfully submitted,

/s/ Brent Caslin

Brent Caslin
Kelly M. Morrison
JENNER & BLOCK LLP
515 S. Flower St., Ste. 3300
Los Angeles, CA 90071
Tel: 213-239-5100
bcaslin@jenner.com
kmorrison@jenner.com

Jeremy M. Creelan
Joseph L. Noga
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel: 212-891-1600
jcreelan@jenner.com
jnoga@jenner.com

*Counsel for Defendant-Appellee Unison Agreement Corporation*

ii

## **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES...........................................................1

STATUTORY, REGULATORY, AND LEGISLATIVE
      AUTHORITIES ........................................................................2

STATEMENT OF THE CASE...............................................................2

    I.     The Olsons' Dismissed Claims Against Unison. ....................2

    II.    The Olsons Applied for, Accepted, and Entered into a
          HomeOwner Agreement with Unison........................................3

    III.   The Terms and Operation of the HomeOwner Agreement are
          Consistent With an Option. ......................................................9

    IV.   The Washington Legislature is Considering Whether and How
          to Regulate Home Equity Sharing Agreements. ...................13

SUMMARY OF ARGUMENT ............................................................15

STANDARD OF REVIEW .................................................................16

ARGUMENT .......................................................................................17

    I.     The District Court Correctly Dismissed the Olsons' Per Se CPA
          Claim Because the HomeOwner Agreement is an Option and
          Not a Reverse Mortgage Loan. .............................................17

          A.    The Olsons' First Claim Fails as a Matter of Law
                Because They Do Not Allege a Violation of the
                Consumer Loan Act. .................................................17

          B.    The HomeOwner Agreement is an Option. .............19

          C.    The HomeOwner Agreement is Not Credit or a
                Loan...........................................................................21

          D.    The Equitable Mortgage Concept Advanced by DFI
                Does Not Apply Here.................................................32

II.    The District Court Correctly Held that Unison's Marketing of the HomeOwner Agreement is Not Unfair or Deceptive ..................37

       A.    Unison Did Not Engage in Any Deceptive Practices. ....................................................................38

       B.    The HomeOwner Agreement Is Not Unfair. ............................44

III.    There is No Compelling Reason for Certification and this Court is Well Suited to Decide the Issues Raised on Appeal. .....................51

CONCLUSION ........................................................................................54

STATEMENT OF RELATED CASES ....................................................55

CERTIFICATE OF COMPLIANCE .......................................................56

CERTIFICATE OF SERVICE ................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Prop. Rights & Fiscal Resp. v. City of Idaho Falls*,
  742 F.3d 1100 (9th Cir. 2013) .................................................................52, 53

*Am. Cont'l Ins. Co. v. Steen*,
  151 Wash. 2d 512 (2004)...................................................................................21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................................16

*Beckington v. Am. Airlines, Inc.*,
  926 F.3d 595 (9th Cir. 2019) ..........................................................................16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................16

*Bennett v. Donovan*,
  703 F.3d 582 (D.C. Cir. 2013) ........................................................................31

*Carr v. Ashcraft*,
  Nos. 14940-4-III, 16895-6-III, 1999 WL 95992 (Wash. Ct. App.
  Feb. 25, 1999) ..................................................................................................20

*Connecticut Nat'l Bank v. Germain*,
  503 U.S. 249 (1992).........................................................................................18

*Crowley v. Byrne*,
  71 Wash. 444 (1912).........................................................................................20

*In re Custody of Smith*,
  137 Wash. 2d 1 (1998)......................................................................................18

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010) .....................................................................10, 13

*Davis v. HSBC Bank Nev. N.A.*,
  691 F.3d 1152 (9th Cir. 2012) ......................................................41, 43, 44, 45

*Deutsche Bank Nat'l Tr. Co. v. Slotke*,
   192 Wash. App. 166 (2016) ..................................................................29

*Diaz v. N. Star Tr., LLC*,
   16 Wash. App. 2d 341 (2021).............................................................28

*Est. of Brantner v. Ocwen Loan Servicing LLC*,
   799 F. App'x 553 (9th Cir. 2020) .......................................................32

*In re Forfeiture of One 1970 Chevrolet Chevelle*,
   166 Wash. 2d 834 (2009).....................................................................24

*Foster v. EquityKey Real Est. Invs. L.P.*,
   No. 17-00067, 2017 WL 1862527 (N.D. Cal. May 9, 2017) .......................24, 25

*Freeman v. Time, Inc.*,
   68 F.3d 285 (9th Cir. 1995) ................................................................43

*Goldwater Bank, N.A. v. Elizarov*,
   No. 21-00616, 2022 WL 18231680 (C.D. Cal. Dec. 12, 2022) .........................24

*Gordon v. Virtumundo, Inc.*,
   575 F.3d 1040 (9th Cir. 2009) ............................................................32

*In re Grand Union Co.*,
   219 F. 353 (2d Cir. 1914) ...................................................................25

*Gray v. Amazon.com, Inc.*,
   653 F. Supp. 3d 847 (W.D. Wash. 2023) ....................................44, 45

*Gray v. Amazon.com, Inc.*,
   No. 22-800, 2023 WL 3204074 (W.D. Wash. May 2, 2023)..........................41

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
   105 Wash. 2d 778 (1986)...................................................17, 37, 38

*Haywood v. Amazon.com, Inc.*,
   No. 22-01094, 2023 WL 4585362 (W.D. Wash. July 18, 2023).......................49

*Hernandez v. Carpenter*,
   No. 59952-6, 2008 WL 4839658 (Wash. Ct. App. Nov. 10, 2008) .................35

*Hoover v. Bouffleur*,
   74 Wash. 382 (1913)...................................................................................33, 35

*Hummel v. Nw. Tr. Servs., Inc.*,
   180 F. Supp. 3d 798 (W.D. Wash. 2016), *aff'd*, 740 F. App'x 142
   (9th Cir. 2018)...................................................................................28

*Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*,
   162 Wash. 2d 59 (2007)....................................................................40

*James B. Nutter & Co. v. Estate of Murphy*,
   478 Mass. 664 (2018) .......................................................................31

*James B. Nutter & Co. v. Namahoe*,
   528 P.3d 222 (Haw. 2023) ..................................................................4

*James v. Safeguard Props. LLC*,
   821 F. App'x 683 (9th Cir. 2020) .......................................................53

*Johnson v. Nat'l Bank of Com. of Tacoma*,
   65 Wash. 261 (1911)..........................................................................36

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
   909 F.3d 446 (D.C. Cir. 2018) ...........................................................13

*Kater v. Churchill Downs Inc.*,
   886 F.3d 784 (9th Cir. 2018) .............................................................10

*Klem v. Wash. Mut. Bank*,
   176 Wash. 2d 771 (2013)........................................................38, 44, 46

*Krefting v. Johnso*n,
   No. 54520-5-I, 2005 WL 1347684 (Wash. Ct. App. June 6, 2005) ...................20

*Lavis v. Reverse Mortg. Solutions, LLC*,
   No. 17-209, 2018 WL 2171444 (S.D. W. Va. May 9, 2018) .............................43

*Lehman Bros. v. Schein*,
   416 U.S. 386 (1974).............................................................................51

*Meyer v. Nw. Tr. Servs. Inc.*,
   712 F. App'x 619 (9th Cir. 2017) ....................................................27, 29, 38, 40

*Micomonaco v. State of Wash.*,
  45 F.3d 316 (9th Cir. 1995) ...................................................................53

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ............................................................................37

*Pacheco v. United States*,
  21 F.4th 1183 (9th Cir. 2022) ...............................................................51

*Panag v. Farmers Ins. Co. of Wash.*,
  166 Wash. 2d 27 (2009) ................................................................37, 48

*Phillips v. Blaser*,
  13 Wash. 2d 439 (1942)..............................................33, 34, 35, 36

*Plunkett v. Castro*,
  67 F. Supp. 3d 1 (D.D.C. 2014) ...........................................................31

*Potter v. City of Lacey*,
  46 F.4th 787 (9th Cir. 2022) ...............................................................51

*Restaurant Dev., Inc. v. Cananwill, Inc.*,
  150 Wash. 2d 674 (2003)................................................................18, 49

*Schiff v. Liberty Mut. Fire Ins. Co.*,
  542 P.3d 1002 (Wash. 2024) ................................................................26

*State v. Kaiser*,
  161 Wash. App. 705 (2011) ..................................................................48

*State v. Schwab*,
  103 Wash. 2d 542 (1985)................................................................49, 50

*Syngenta Seeds, Inc. v. County of Kauai*,
  842 F.3d 669 (9th Cir. 2016) ...............................................................53

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978)................................................................................27

*Territory of Alaska v. Am. Can Co.*,
  358 U.S. 224 (1959)................................................................................13

*Thompson v. Paul*,
  547 F.3d 1055 (9th Cir. 2008) ...........................................................53

*Turner v. Gunderson*,
  60 Wash. App. 696 (1991)..................................................................19

*White v. Mortg. Elec. Registration, Inc.*,
  No. 17-0906, 2017 WL 2574014 (W.D. Wash. June 14, 2017).......................29

*Whitworth v. Entai Lumber Co.*,
  36 Wash. 2d 767 (1950).....................................................................19

*Yamashita v. LG Chem, Ltd.*,
  48 F.4th 993 (9th Cir. 2022) ..............................................................51

*Young v. Toyota Motor Sales, U.S.A.*,
  196 Wash. 2d 310 (2020)....................................................................41

**Statutes**

12 U.S.C. § 1715z-20..........................................................................31

15 U.S.C. § 45(n) ..............................................................................44

15 U.S.C. § 1601(a) ...........................................................................22

15 U.S.C. § 1602(f) ...........................................................................22

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1332(a) ...........................................................................1

28 U.S.C. § 1332(d)(2).........................................................................1

RCW § 2.60.020................................................................................51

RCW § 19.86.920...............................................................................25

RCW § 19.144.010(11) .........................................................................29

RCW § 31.04.015...............................................................................22

RCW § 31.04.015(24)........................................................................23, 29

RCW § 31.04.505(5)...........................................................................*passim*

ix

RCW § 61.24.020 ................................................................................28, 29

RCW § 64.60.010(3)(c) ...............................................................................24

RCW § 64.60.010(3)(e) ...............................................................................24

**Federal Rules**

Fed. R. Civ. P. 12(b)(6) ..............................................................................16

Fed. R. Evid. 201(b)(2) ...............................................................................13

**Other Authorities**

12 C.F.R. § 226.1 ........................................................................................22

12 C.F.R. § 1026.2(a)(14) ...........................................................................22

12 C.F.R. Pt. 1026, Supp. I, Part 1, cmt. 2(a)(14)(1)(vii) ..........................22

12 C.F.R. § 1026.33(a) ................................................................................23

25 David K. DeWolf, et al., Wash. Practice, Contract Law & Practice
    § 2:16 (3d ed. 2023) ..............................................................................19

25 David K. DeWolf, et al., Wash. Practice, Contract Law & Practice
    § 19:42 (3d ed. 2020) ............................................................................20

*California Dream For All: A Proposed Shared Appreciation Loan
    Investment Fund For The State of California*, California State
    Treasurer's Office (June 6, 2022),
    https://www.treasurer.ca.gov/publications/ca-dream-for-all-
    report.pdf ...............................................................................................47

FHA: Strengthening the Home Equity Conversion Mortgage Program,
    82 Fed. Reg. 7094 (Jan. 19, 2017) ..................................................46, 47

H.B. 2081, 68th Leg., Reg. Sess. (Wash. 2024) ........................................13

H.B. Analysis on H.B. 2081, 68th Leg., Reg. Sess. (Wash. 2024) ............13

H.B. Rep. on H.B. 2081, 68th Leg., Reg. Sess. (Wash. 2024) ........13, 14, 26

*HB 2081 - 2023-24*, Washington State Legislature,
https://app.leg.wa.gov/billsummary?BillNumber=2081&Year=202
3 (last visited Apr. 25, 2024) .................................................................13

*Option*, Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/option (last visited Apr. 15, 2024) .............................19

*Product Spotlight: Shared Appreciation Mortgages*, Wash. State
Dep't of Fin. Insts., https://dfi.wa.gov/newsletter/winterspring-
2023-cs-newsletter/product-spotlight-shared-appreciation-
mortgages (last visited Apr. 15, 2024)........................................................27, 28

*Regulating Home Equity Sharing Agreements Under the Consumer
Loan Act: Hearing on Engrossed Substitute S.B. 5968 Before the
H. Consumer Protec. & Bus. Comm.*, 68th Leg., Reg. Sess. (Wash.
2024) .................................................................................................14

Restatement (Third) of Property (Mortgages) (1997) ................................................31

S.B. 5968, 68th Leg., Reg. Sess. (Wash. 2024).........................................................13

S.B. Rep. on Engrossed Substitute S.B. 5985, 68th Leg. Reg. Sess.
(Wash. 2024).............................................................................................14

S.B. Rep. on S.B. 5968, 68th Leg., Reg. Sess. (Wash. 2024) ...........................13, 26

*S&P CoreLogic Case-Schiller WA-Seattle Home Price Index*, Federal
Reserve Bank of St. Louis,
https://fred.stlouisfed.org/series/SEXRNSA (Mar. 26, 2024 8:11
AM)........................................................................................................10, 12

Sam Brittingham, *Aging Out of Place: The Toll of Reverse Mortgages
and How to Fix the Program*, 29 Eld. L. J. 149 (2021)......................................46

Sarah B. Mancini & Odette Williamson, *Reversing Course: Stemming
the Tide of Reverse Mortgages Foreclosures Through Effective
Servicing and Loss Mitigation*, 26 Elder L.J. 85 (2018) ..................................46

*SB 5968 - 2023-24*, Washington State Legislature,
https://app.leg.wa.gov/billsummary?billnumber=5968&year=2024
(last visited Apr. 25, 2024) ...............................................................................13

xi

*Selling Guide Announcement (SEL-2023-04)*, Fannie Mae (May 23, 2023), https://singlefamily.fanniemae.com/media/35881/display .....................47

Substitute H.B. 2081, 68th Leg., Reg. Sess. (Wash. 2024) .....................................14

Wash. Admin. Code § 458-20-19404A(3)(j).............................................................23

*What is a reverse mortgage?*, Consumer Fin. Prot. Bureau (Aug. 28, 2023), https://www.consumerfinance.gov/ask-cfpb/what-is-a-reverse-mortgage-en-224/ ....................................................................................30

## JURISDICTIONAL STATEMENT

The United States District Court for the Western District of Washington had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a) and 1332(d)(2).

The District Court dismissed this action without prejudice on August 30, 2023. Excerpts of Record ("ER")-6–7. In response, Charles Boyd Olson and Janine Olson ("the Olsons" or "Appellants") notified the District Court that they did "not intend to amend their complaint" and "request[ed] the Court enter judgment consistent with its ruling on the motion to dismiss." Supplemental Excerpts of Record ("SER")-3. Per the Olsons' request, the District Court entered judgment in favor of Unison Agreement Corporation ("Unison") on October 12, 2023. ER-237. The Olsons filed a Notice of Appeal on October 16, 2023. ER-234. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues presented by this appeal are:

1.      Whether the District Court correctly held that Unison's HomeOwner Agreement is not a loan under the Washington Consumer Loan Act and the Olsons thus fail to state a per se violation of the Washington Consumer Protection Act;

1

2.     Whether the District Court correctly held that the Olsons do not state a claim under the Washington Consumer Protection Act because they do not allege any deceptive or unfair acts; and

3.     Whether, despite not requesting certification from the District Court, the Olsons' run-of-the-mill Consumer Protection Act claims now warrant certification to the Washington Supreme Court.

## STATUTORY, REGULATORY, AND LEGISLATIVE AUTHORITIES

Pertinent statutory, regulatory, and legislative materials are set forth in an addendum pursuant to Federal Rule of Appellate Procedure 28(f) and Circuit Rule 28-2.7.

## STATEMENT OF THE CASE

### I.     The Olsons' Dismissed Claims Against Unison.

In December 2022, the Olsons filed a putative class action complaint against Unison. ER-214–33 (the "Complaint").[1] The Complaint admits that the HomeOwner Agreement the Olsons entered with Unison is not a reverse mortgage loan under the Washington Consumer Loan Act. *See* ER-219, ¶ 4.26. Nonetheless, the Complaint urges the court, in equity, to recharacterize the HomeOwner Agreement as an "equitable reverse mortgage loan." *See, e.g.*, ER-218–19, ¶¶ 4.24–4.27.

---

[1] The Complaint was also filed on behalf of Maggie Colin. ER-214. Ms. Colin's claims were compelled to arbitration and then voluntarily dismissed by Ms. Colin. ER-241–42, Dkt. Nos. 38, 49.

The Complaint asserts three claims under the Washington Consumer Protection Act (the "CPA"), all premised upon recharacterizing the HomeOwner Agreement from an option to a reverse mortgage loan. The Complaint's first claim alleges a per se CPA violation, contending that if the HomeOwner Agreement is an "equitable reverse mortgage loan[]" then Unison did not follow the requirements for issuing a reverse mortgage loan under Washington's Consumer Loan Act. ER-225–227. Two additional claims complain that the "marketing and selling" of the HomeOwner Agreement is unfair and deceptive because it describes the HomeOwner Agreement as an option and not a loan. ER-228–30.[2]

## II.    The Olsons Applied for, Accepted, and Entered into a HomeOwner Agreement with Unison.

The Olsons allege that, in early 2019, they received a flyer in the mail stating that an agreement with Unison could allow them to "access the equity locked in [their] home" and would include "no monthly payments and no interest." ER-220, ¶ 4.38. After receiving the flyer, Mr. Olson allegedly spoke with a Unison representative to learn about the HomeOwner Agreement. ER-220, ¶ 4.39. The Olsons do not allege that anything false or misleading was stated during that call. *See id.* "Because they needed money and did not think refinancing their home again was feasible at that time, the Olsons decided to apply for a HomeOwner Agreement

---

[2] Appellants do not challenge the dismissal of their fourth and fifth claims. *See* ER-6; ER-230; *see generally* Opening Brief of Plaintiffs-Appellants ("Op. Br.").

to obtain cash to cover their credit card debt and daily living expenses." ER-220,

¶ 4.39.[3]

On March 25, 2019, Unison extended the Olsons an "Offer to enter into a

Unison HomeOwner Agreement." ER-164. The first page of the offer package

delivered to the Olsons explained to them:

> If you accept our Offer, you will grant Unison Agreement Corp. ("Unison") an Option to purchase a percentage interest in your home in the future. The percentage interest in your home will be 70.00% interest . . .

*Id.* The front page also directed the Olsons to "read the full Offer Package together

with the enclosed **Important Information Notice** and the **Total Unison Cost**

**Estimate.**" *Id.*[4] The offer package included both a "Summary of Financial Terms,"

ER-166, and more detailed information about those terms. ER-169–78. The

"**IMPORTANT INFORMATION NOTICE AND TOTAL UNISON COST**

---

[3] Because Appellants' brief relies heavily on anecdotes about non-parties, it is also worth noting what was not pled. The Olsons do not allege they were subject to "high-pressure sales tactics" or "predatory . . . salespeople." *Compare* Op. Br. at 2, 12–13, *with* ER-219–21. The Olsons do not allege confusion about whether they would be required to continue paying their property taxes or maintaining their home after signing an agreement with Unison, or that they have been unable to do so. *Compare* Op. Br. at 2, 8–11, 51–52, *with* ER-219–21. The Olsons do not allege there has been any attempt to foreclose on their home (*see* ER-219–21), whether through a fraud on the court (*see James B. Nutter & Co. v. Namahoe*, 528 P.3d 222, 240–42 (Haw. 2023), cited *passim* in Op. Br.), or otherwise (*see* Op. Br. at 50–51). This case has nothing in common with the many tales recited throughout the Olsons' brief.

[4] Unless otherwise indicated, all emphasis is in original.

4

ESTIMATE (TUCE)" disclosed "IMPORTANT INFORMATION" that Unison again directed the Olsons to "**Please Read Carefully**," including:

> **If you have not already discussed the Unison HomeOwner Agreement with your own advisors (legal, financial, estate planning, tax) and family members, we strongly urge you to do so before proceeding any further.** You may want to consider other financial alternatives available to you, as well as the risks associated with this transaction.
>
> . . .
>
> **OTHER IMPORTANT TERMS TO BE AWARE OF:**
>
> 1. By signing a Unison HomeOwner Agreement, you are granting Unison the right to purchase a specific percentage of your Property under certain circumstances. Thus, when your Property is sold (assuming Unison exercises the option at that time), Unison will receive a portion of the *gross sale proceeds* (before real estate commissions and other selling costs) representing its percentage interest in your Property . . .

ER-169–71. The Olsons signed an "**ACKNOWLEDGMENT AND SIGNATURE**" page promising Unison that they had "received a copy of this **Important Information Notice**," "read and understand it, and have received answers to any questions [they] may have had about its content and about the Unison HomeOwner Agreement," and "received, read and understand the Unison HomeOwner Program Guide and have consulted the professional advisors and family members of [their] choosing." ER-174.

On March 27, 2019, the Olsons accepted Unison's offer and executed the HomeOwner Agreement. ER-220, ¶ 4.40; *see, e.g.*, ER-84. The key document is the

five-page Option Agreement, which the Olsons hand-signed. ER-80–84. The Option Agreement states the nature of the transaction in plain language, setting forth: the $64,750 Investment Payment to be made by Unison to the Olsons (§ 1(a)); the granting of the option right to Unison to purchase an undivided 70% interest (§ 1) in a specific parcel of real property (§ 1(a) & Ex. A); the 30-year Term of the option (§ 2); the $370,000 agreed value of the property at option origination (§ 4); the Exercise Events under which the option can be exercised (§ 2[5]); a right for the Olsons to buy out the option upon an Exercise Event (§ 4); the maximum amount of debt with other parties that can be placed on the property so the option will remain exercisable (§ 8); a statement that a security instrument will be filed to secure the HomeOwner Agreement (§ 9); and a statement regarding the Nature of the Option and Initial Payment (§ 6). ER-80–85.[6]

In summary, the Olsons granted Unison an option to purchase a 70% undivided interest in their property in the future for $194,250, in exchange for an immediate payment of $64,750. ER-80–84, § 1 (the "Option"). The Option can be

---

[5] The Exercise Events are (a) the Expiration Date; (b) arms' length sale of the Property; (c) death of the last surviving owner; or (d) following a material and uncured event of owner default. ER-80–81, § 2.

[6] There are also two provisions not relevant here: a right for the Olsons to terminate the option after three years based on the then-current property value (ER-82, § 7) and a provision regarding homeowner events of default (*id.* § 9). The Olsons do not allege they sought to terminate the option and they have not defaulted.

exercised only after the occurrence of one of four Exercise Events, none of which are within Unison's control (and none of which have occurred). ER-80–81, § 2. The most common exercise event is the owners' sale of the property. If a sale occurs, the Olsons may elect to settle the Option and terminate it with the proceeds of a sale disbursed as follows: (1) Unison receives the sale price multiplied by the 70% percentage undivided interest it can purchase minus the $194,250 second payment Unison must make in exercising the Option and (2) the homeowner receives the remaining 30% of the sale price of the property plus the $194,250 second payment owed by Unison. ER-81–82, § 4.

Some examples may be helpful to understand the economics of the Option. If the Olsons decide to sell their property for $450,000, they would communicate that to Unison. Based on that sale price, Unison would inform the Olsons that it wants to exercise the Option and the sale proceeds would be disbursed as $329,250 to the Olsons (the $194,250 second payment from Unison plus 30% of the sale price) and $120,750 to Unison (70% of the sale price minus the $194,250 second payment to the Olsons). The earlier $64,750 payment to the Olsons is irrelevant to these calculations, and the calculations do not change whether the Olsons sell the property five or 25 years after the option grant. Either way, in this first example, the Olsons would receive a total of $394,000 over the lifetime of the Option on a home appraised at $370,000, effectively sharing in $24,000 of the $80,000 of appreciation.

If the value of the Olsons' property moderately decreases, Unison may still exercise the Option. For example, if the Olsons sell their property for $300,000, Unison would inform the Olsons that it wants to exercise the Option and the sale proceeds would be disbursed as $284,250 to the Olsons (the $194,250 second payment from Unison plus 30% of the sale price) and $15,750 to Unison (70% of the sale price minus the $194,250 second payment to the Olsons). Again, the earlier $64,750 payment to the Olsons is irrelevant to these calculations and the calculations would not change regardless of whether the Olsons sell the property five or 25 years after the option grant. If the Olsons had not entered into the Option, they would have suffered $70,000 of depreciation since the date of the option ($370,00 appraised value at option grant minus the $300,000 sale price). But, by entering into the Option with Unison the Olsons would in this example receive a total of $349,000 over the lifetime of the option. That is $49,000 more than the sale price, effectively shifting to Unison $49,000 of the $70,000 depreciation in the property that they would have otherwise borne. In that way Unison shares in the depreciation of the property.

If the value of the Olsons' home were to decrease significantly, as in the example of a 60% drop offered by Appellants (Op. Br. at 7), and the Olsons were to sell their property for $222,000, Unison would not exercise the Option. Because the second payment required to exercise the Option ($194,250) would exceed the value of Unison's potential 70% interest ($155,400), Unison would decline to exercise the

Option and suffer a $64,750 loss. The Olsons would receive the full sale price of the property ($222,000) in addition to the $64,750 initial payment received from Unison.

As to the Nature of the Option, the Option Agreement explains:

> The Unison Investment Payment is not a loan. The Unison Investment Payment is not a principal amount which [Unison] is contractually or otherwise entitled to recover at Term or at Option Exercise. The Investor Proceeds [i.e., the net amount obtained by Unison at option exercise] may be greater than, equal to, or less than the Unison Investment Payment, or zero, depending upon the change in value of the Property (the difference between the Original Agreed Value and the Ending Agreed Value) between the Effective Date and the Exercise Event. Owner will not be required to make any monthly interest or other periodic payments to [Unison] calculated upon the amount of the Unison Investment Payment, nor will any periodic payment obligations be imposed upon or accrue on the amount of the Unison Investment Payment as indebtedness to Owner.

ER-82, § 6. The Option Agreement also includes a Summary of Financial Terms and Fees. ER-83, § 10.

The Complaint admits that the HomeOwner Agreement is not a reverse mortgage loan under the Washington Consumer Loan Act. *See* ER-219, ¶ 4.26.

## III.    The Terms and Operation of the HomeOwner Agreement are Consistent With an Option.

Option agreements have been used in real estate and other contexts for a long time. The HomeOwner Agreement functions consistent with its drafting as an option. This structure effectively permits Unison to share in the increase or decrease in the future value of a home.

As explained above, depending on the housing market at the time an Exercise Event occurs, Unison will either (i) exercise the Option for a gain, (ii) exercise the Option at a loss, or (iii) because it is worthless, not exercise the Option at all. Applying the terms of the Option to different historical time periods demonstrates that these outcomes are not merely hypothetical examples of what could happen in the future, such as those summarized above. For illustration, assume the Olsons' Option was granted in March 2007 and the home value followed the S&P/Case-Shiller WA-Seattle Home Price Index ("SEXRNSA"), which is made available by the St. Louis Federal Reserve Bank.[7] Starting in March 2007 (index measured at 186.44), housing prices in the Seattle area rose slightly and then fell dramatically. Possible outcomes for the March 2007 option under the Olsons' terms include:

- **<u>A Total Loss to Unison and Loss Mitigation for the Olsons</u>**. If the property had sold between January 2011 and May 2012 (a period of the index below 139.83), the price drop would have been over 25% and the option would not have been exercised. The Olsons would have kept the initial payment ($64,750) without Unison ever acquiring an interest in the property. The Olsons would have received the entire sale price of the property, with no money going to Unison at any point.[8]

---

[7] *See S&P CoreLogic Case-Schiller WA-Seattle Home Price Index*, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/SEXRNSA (Mar. 26, 2024 8:11 AM) (providing monthly data from January 1990 through January 2024). The SEXRNSA is subject to judicial notice and thus properly considered by this Court. *See Kater v. Churchill Downs Inc.*, 886 F.3d 784, 786, 788 n.3 (9th Cir. 2018); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).

[8] For example, if the property were sold five years after the March 2007 option grant, in March 2012, the price would have decreased 29.6% (index at 186.44 dropped to

- **A Partial Loss for Unison and Loss Mitigation for the Olsons**. If the property had sold during the period June 2012 through December 2015 (a period of the index between 139.89 and 186.26), there would have been a price drop, but Unison would have exercised the option. Unison would have received some sale proceeds, but they would have been less than the initial payment to the Olsons ($64,750).[9] The Olsons again would have received more than the entire sale price of the property.

- **Break-Even and Benefit of Up-Front Payment to the Olsons**. In January 2016, the price index was nearly the same as March 2007 (*i.e.*, 186.44 vs. 186.49). In this scenario, Unison and the Olsons would have effectively broken even, but with the Olsons having had the benefit of Unison's up-front initial payment since March 2007.

- **Profitable for Unison and the Olsons**. Starting in February 2016, the price index was higher than in March 2007, with a 50% rise in price from the March 2007 option date first reached in September 2020, over 13 years after the option issued.[10]

---

131.22), the sale price would have been $260,413, and an undivided 70% interest would have been worth $182,289. Because the $194,250 second payment Unison would have had to make to exercise the option would have been more than the $182,289 property interest Unison could purchase, it would not have exercised the option. The Olsons would have received the $64,750 initial payment and the entire sale price. Because of the option, they would have received $325,163 in connection with a property they sold for only $260,413.

[9] For example, if the property were sold in March 2014, the price would have decreased 13.1% (index at 186.44 dropped to 162.05), the sale price would have been $321,597, and an undivided 70% interest would have been worth $225,118. Because the $194,250 second payment Unison would have had to make to exercise the option was less than the $225,118 interest Unison could purchase, it would have exercised the option to mitigate its loss to -$33,882 ($225,118 - $194,250 second payment - $64,750 initial payment). The Olsons would have received 30 percent of the sale price, which is $96,479, plus the second payment of $194,250, in addition to the $64,750 initial payment, for a total of $355,479 in connection with a property they sold for only $321,597.

[10] This scenario is similar to the hypothetical posed by Appellants (*see* Op. Br. at 33–34), in which the Olsons would receive a total of $375,704 upon the sale of their

11

In short, Unison is not obligated to exercise the Option, and whether it does so—and the results of any Option exercise—will depend on the nature of the market for the property when the Olsons decide to sell. *See also* Wash. State Dep't of Fin. Insts. Amicus Curiae Brief ("DFI Br.") at 5, 13 (acknowledging that the outcome of the Option "depend[s] on market value appreciation," and Unison will receive "an amount that is more than the initial investor payment to the homeowners" only "if property values increase"). That outcome is not preordained, as Appellants' arguments appear to presume. Indeed, according to the most recent data, after peaking in May 2022, the Seattle area housing market has fallen by 12.5% as of January 2024.[11] The Option that the Olsons granted to Unison may ultimately have no value, little value, or substantial value depending on the state of the market for their property when they decide to sell.[12]

---

home (valued at $370,000 when the option was granted in 2019), in addition to the $64,750 payment received from Unison in 2019.

[11] SEXRNSA, *supra* n.7 (index of 414.01 in May 2022 dropped to 362.04 in January 2024).

[12] Examples of "Unison Gain [or] (Loss) On Investment" under hypothetical scenarios falling into each of these categories—increase in property value, "larger increase," decrease in property value, "larger decrease," and no change—were included in the Olsons' Offer to enter into a Unison HomeOwner Agreement. ER-176.

**IV.    The Washington Legislature is Considering Whether and How to Regulate Home Equity Sharing Agreements.**

In January 2024, bills were proposed in both the Washington State House (HB 2081) and Senate (SB 5968), which would "regulat[e] home equity sharing agreements under the consumer loan act." H.B. 2081, 68th Leg., Reg. Sess. (Wash. 2024); S.B. 5968, 68th Leg., Reg. Sess. (Wash. 2024).[13] The bills were proposed because "HESAs [home equity sharing agreements] are not currently covered under the Washington Consumer Loan Act." S.B. Rep. on S.B. 5968, at 2, 68th Leg., Reg. Sess. (Wash. 2024); *see also* H.B. Analysis on H.B. 2081, at 2, 68th Leg., Reg. Sess. (Wash. 2024) (explaining that, if passed, "[h]ome equity sharing agreements [would be] added as a residential mortgage loan under the Consumer Loan Act"); H.B. Rep. on H.B. 2081, at 3, 68th Leg., Reg. Sess. (Wash. 2024) (summarizing public

---

[13] The Court is entitled to take judicial notice of the legislative process concerning Washington House Bill 2081 and Senate Bill 5968, which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), including the Washington State Legislature's webpages tracking the bills. *See HB 2081 - 2023-24*, Washington State Legislature, https://app.leg.wa.gov/billsummary?BillNumber=2081&Year=2023 (last visited Apr. 25, 2024); *SB 5968 - 2023-24*, Washington State Legislature, https://app.leg.wa.gov/billsummary?billnumber=5968&year=2024 (last visited Apr. 25, 2024); *Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 227 (1959) (taking judicial notice of legislative history of a bill); *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018) (taking judicial notice of "legislative record," including "what was said" during congressional hearings and in legislative materials); *Daniels-Hall*, 629 F.3d at 998–99 (taking judicial notice of information made publicly available on government websites). For the Court's convenience, copies of cited legislative materials are included in the Addendum.

testimony advocating for the bill on the ground that "[t]here are no current regulations or limits for these financial instruments").

Both proposed bills were subsequently revised. For example, Substitute House Bill 2081 would require "[t]he department of financial institutions [to] conduct a study on home equity sharing agreements that reviews the need for regulation along with potential recommendations for future regulation or legislation" and to "submit a report to the appropriate committees of the legislature . . . by December 1, 2024, with the department's recommendations regarding regulations for the home equity sharing agreement market." Substitute H.B. 2081, 68th Leg., Reg. Sess. (Wash. 2024).

Public hearings have been held in both the state House and Senate, including testimony from dozens of stakeholders. The Olsons' legal counsel, Blythe Terrell, and Brendan Donckers, author of the Brief of Amicus Curiae Northwest Consumer Law Center ("NWCLC Br."), testified in favor of the bills. H.B. Rep. on H.B. 2081, at 4; S.B. Rep. on Engrossed Substitute S.B. 5985, at 5, 68th Leg. Reg. Sess. (Wash. 2024); *Regulating Home Equity Sharing Agreements Under the Consumer Loan Act: Hearing on Engrossed Substitute S.B. 5968 Before the H. Consumer Protec. & Bus. Comm.*, 68th Leg., Reg. Sess. (Wash. 2024).[14] *Amicus curiae* Washington State

---

[14] Video recordings of the hearings are available at the House and Senate webpages cited in footnote 13.

Department of Financial Institutions ("DFI") submitted written testimony. On February 8, 2024, the Senate passed Substitute Senate Bill 5986 and referred it to the House for consideration. Neither bill passed the full Legislature before the close of the 2024 session, with both returning to their respective rules committees.

## SUMMARY OF ARGUMENT

This Court should affirm the District Court's dismissal of the Olsons' claims for the following reasons:

1.      The District Court correctly held, consistent with the conclusions of other courts, regulators, and lawmakers, that the HomeOwner Agreement is an option and not a loan. The HomeOwner Agreement has all the hallmarks of an option. In contrast, as the Olsons concede, it does not meet the statutory definition of a reverse mortgage loan. Recent legislative activity confirms that home equity sharing arrangements like the HomeOwner Agreement are not subject to the Consumer Loan Act as drafted. Appellants' per se CPA claim was thus properly dismissed.

2.      The District Court also properly dismissed the Olsons' second and third CPA claims because the Complaint does not plausibly allege unfair or deceptive conduct. To the contrary, any allegations of unfairness or deception are belied by the HomeOwner Agreement and offer documents the Olsons reviewed and signed.

15

3.      There are no compelling reasons for certification to the Washington Supreme Court. This appeal raises run-of-the-mill questions of statutory interpretation that this Court is well equipped to answer.

For those reasons, this Court should affirm the judgment below.

## STANDARD OF REVIEW

This Court reviews a district court's dismissal of an action under Federal Rule of Civil Procedure 12(b)(6) *de novo*. *Beckington v. Am. Airlines, Inc.*, 926 F.3d 595, 604 (9th Cir. 2019). The Court is not limited by the District Court's reasoning, and it "may affirm on any ground supported by the record." *Id.*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must offer "more than labels and conclusions," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and the court need not accept as true a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. Rather, the plaintiff must "allege more by way of factual content to 'nudg[e]' his claim" of unlawful action "across the line from conceivable to plausible." *Id.* at 683 (quoting *Twombly*, 550 U.S. at 570). The District Court correctly found that the Olsons' allegations do not satisfy this standard.

# ARGUMENT

**I.     The District Court Correctly Dismissed the Olsons' Per Se CPA Claim Because the HomeOwner Agreement is an Option and Not a Reverse Mortgage Loan.**

The District Court properly dismissed the Olsons' per se CPA claim because the HomeOwner Agreement falls within the well-understood parameters of what constitutes an option and is not a reverse mortgage loan under the Consumer Loan Act. Indeed, the Olsons' Complaint concedes that the HomeOwner Agreement does not meet the statutory definition of a reverse mortgage loan. ER-219, ¶ 4.26. Recent legislative activity further confirms that home equity sharing arrangements like the HomeOwner Agreement are not subject to the Consumer Loan Act. Because it does not plead the necessary violation of a predicate statute, the Olsons' per se CPA claim fails.

**A.     The Olsons' First Claim Fails as a Matter of Law Because They Do Not Allege a Violation of the Consumer Loan Act.**

To state a "per se" CPA claim, a plaintiff must allege (1) that "a statute which has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce has been violated"; (2) a public interest impact; (3) an injury to the plaintiff in their business or property; and (4) causation between the injury and the statutory violation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 780, 786 (1986) (en banc).

17

The Olsons' per se CPA claim fails at the outset because it does not plead an underlying statutory violation. Specifically, the Olsons premise their first CPA claim on the Consumer Loan Act (ER-225) but fail to plead a violation of that statute.

In evaluating whether the HomeOwner Agreement violates the Consumer Loan Act, the Court must focus on the plain language of the Consumer Loan Act because it must "assume the Legislature meant exactly what it said and apply the statute as written." *In re Custody of Smith*, 137 Wash. 2d 1, 8 (1998) (en banc) (citation omitted) (admonishing that courts should not "question the wisdom of a statute even [if] its results seem unduly harsh"); *accord Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Thus, the Court must construe the Consumer Loan Act "such that all of the language is given effect, and no portion is rendered meaningless or superfluous." *Restaurant Dev., Inc. v. Cananwill, Inc.*, 150 Wash. 2d 674, 682 (2003) (en banc) (citation omitted).

The Olsons' per se CPA claim fails because, as they concede in their Complaint, the HomeOwner Agreement is not a "reverse mortgage loan" under the Consumer Loan Act. *See* ER-219, ¶ 4.26 (alleging that the HomeOwner Agreement "meets <u>nearly all</u> of the criteria for a reverse mortgage loan" under Washington's Consumer Loan Act) (emphasis added). The HomeOwner Agreement is not a

"reverse mortgage loan" because it is not "credit." RCW § 31.04.505(5) ("'Reverse mortgage loan' means a nonrecourse consumer credit obligation . . ."). Rather, as the District Court properly held, the HomeOwner Agreement "is an option contract" pursuant to which Unison "paid the Olsons valuable consideration ($64,750) to secure an option to participate in the appreciation of Olsons' property." ER-5.

### B. The HomeOwner Agreement is an Option.

The common definition of an "option" is "a contract conveying a right to buy or sell designated securities, commodities, or property interest at a specified price during a stipulated period."[15] The Washington Supreme Court has defined an option in similar terms: "[a]n option to purchase property is a contract wherein the owner, in return for valuable consideration, agrees with another person that the latter shall have the privilege of buying the property within a specified time upon the terms and conditions expressed in the option." *Whitworth v. Entai Lumber Co.*, 36 Wash. 2d 767, 770 (1950); *see also Turner v. Gunderson*, 60 Wash. App. 696, 700 (1991) (same).

Under Washington law, "[t]he essential terms of an option contract for the sale of land include the parties, a description of the property, and a means for determining the purchase price." 25 David K. DeWolf, et al., Wash. Practice,

---

[15]     *Option*,     Merriam-Webster     Dictionary,     https://www.merriam-webster.com/dictionary/option (last visited Apr. 15, 2024).

Contract Law & Practice § 2:16 (3d ed. 2023); *see also* 25 David K. DeWolf, et al., Wash. Practice, Contract Law & Practice § 19:42 (3d ed. 2020) (providing sample form for an option on real property). An option may be granted to purchase a partial undivided interest in a property. *See, e.g.*, *Crowley v. Byrne*, 71 Wash. 444, 445–46 (1912) (holding that an option to purchase a 50% undivided interest would be "regard[ed] . . . as a pure option"); *Krefting v. Johnso*n, No. 54520-5-I, 2005 WL 1347684, at *2 (Wash. Ct. App. June 6, 2005) (addressing option to purchase 50% undivided interest in real property); *Carr v. Ashcraft*, Nos. 14940-4-III, 16895-6-III, at *1-2, 1999 WL 95992 (Wash. Ct. App. Feb. 25, 1999) (addressing option to purchase a 50% undivided interest).

The HomeOwner Agreement easily falls within the definition of an option and contains all the essential terms of an option agreement. Specifically, the Olsons agreed Unison would have the privilege of buying a certain percentage undivided interest (70%) in described property (3718 S 256th Ct., Kent, WA 98032) at a sum certain ($259,000), within a specified time (30 years), under certain conditions (expiration of Term, sale of the Property, death of the owner, or acceptance of option exercise and orderly sale), in exchange for consideration that the Olsons will retain even if the Option is not exercised ($64,750). ER-80–85, §§ 1, 2 & Ex. A.

### C.    The HomeOwner Agreement is Not Credit or a Loan.

Appellants acknowledge that a transaction is a "reverse mortgage loan" under the Consumer Loan Act only if it is a "nonrecourse [] <u>credit</u> obligation." *See* Op. Br. at 14, 30 (quoting RCW § 31.04.505(5)) (emphasis added). Unable to muster an argument that the option is "credit," however, Appellants skip over the threshold "credit" requirement to focus on additional statutory criteria that they argue are met. *See id.* at 30. That approach is non-responsive to the unambiguous requirement that, to be a reverse mortgage loan, the transaction must be "credit." The critical requirement in the definition – "credit" – may not simply be ignored. *See Am. Cont'l Ins. Co. v. Steen*, 151 Wash. 2d 512, 518 (2004) (en banc) ("Legislative definitions included in the statute are controlling."). Because the Olsons offer no argument anywhere in their brief that the HomeOwner Agreement meets the "credit" requirement, they have not even facially challenged the holding below that the transaction is an option and not a reverse mortgage loan.

In any event, the District Court's holding is correct. The Consumer Loan Act does not define "credit." But the federal Truth in Lending Act ("TILA") and accompanying federal regulation, "Reg Z," greatly inform the Consumer Loan Act's use of that term. Both undercut Appellants' position.

Congress enacted TILA to "avoid the uninformed use of consumer credit, and to protect the consumer against inaccurate and unfair credit billing and credit card

practices." 15 U.S.C. § 1601(a); *see also* 12 C.F.R. § 226.1. TILA defines "credit" as "the right . . . to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f); 12 C.F.R. § 1026.2(a)(14). Put simply, a "credit" obligation is debt. It exists when an individual is obligated to repay a sum certain, typically with interest.

An option is not "credit" because the homeowner does not borrow any money and is not obligated to pay any money or interest back. There is no debt. Instead, fundamentally different from credit, the homeowner sells an option that can be exercised in the future under specified circumstances.

To the extent there was any ambiguity as to whether an option might be labeled as credit, the Official Commentary to Reg Z confirms options are not credit by expressly excluding the entering into of an "option" from the definition of "credit" under the rules. 12 C.F.R. Pt. 1026, Supp. I, Part 1, cmt. 2(a)(14)(1)(vii) ("Exclusions. The following situations are not considered credit for purposes of the regulation … vii. The execution of option contracts.").

There are strong reasons to conclude the Washington Legislature intended for the scope of "credit" in Washington law to match the scope of "credit" in TILA. The purposes cited by the Legislature in enacting the Consumer Loan Act echo those cited by Congress in passing TILA. *See* RCW § 31.04.015, Findings—Declarations (deeming the Act "necessary to encourage responsible lending in all credit

transactions, to protect borrowers, and to preserve access to credit in the residential real estate lending market"). The state Legislature also used the same language to define a "reverse mortgage loan" under the state's Consumer Loan Act—"nonrecourse consumer credit obligation"—as Reg Z. *Compare* RCW § 31.04.505(5) ("'Reverse mortgage loan' means a nonrecourse consumer credit obligation in which . . . "), *with* 12 C.F.R. § 1026.33(a) ("reverse mortgage transaction means a nonrecourse consumer credit obligation in which . . ."). Further, the Washington Legislature expressly incorporated the TILA definition of "residential mortgage loan" into state law. *See* RCW § 31.04.015(24) ("'residential mortgage loan' means any loan primarily for personal, family, or household use . . . as defined in the truth in lending act"); DFI Br. at 7. The Court should not construe "credit" under the Consumer Loan Act to encompass options when the federal law on which it was modeled plainly does not encompass options.

Other state statutes and regulations similarly recognize that options are not credit or loans under Washington law. For example, the Washington Excise Tax Rules for Financial Institutions explicitly exclude options from the definition of loans. Wash. Admin. Code § 458-20-19404A(3)(j) (a "'[l]oan' means any extension of credit . . . [and] does not include: Futures or forward contracts; options . . . and other similar items"). Further, the Private Transfer Fee Obligation Act excludes both options and loans from the definition of a "private transfer fee" attached to real

23

property, but does so with separate exclusions, one for options, RCW § 64.60.010(3)(e), and another for loans, *id.* § 64.60.010(3)(c), again evidencing the state legislature recognizes the distinction. *See In re Forfeiture of One 1970 Chevrolet Chevelle*, 166 Wash. 2d 834, 842, (2009) (en banc) ("Where the legislature uses different terms we deem the legislature to have intended different meanings.").

The District Court properly concluded that the "the HomeOwner Agreement is an option contract" because "Unison paid the Olsons valuable consideration ($64,750) to secure an option to participate in the appreciation of [their property]," which "Unison is not obliged to exercise." ER-5. Because "Unison is not obliged to exercise its option (if, for example, home prices decrease)," the HomeOwner Agreement is "not a loan." *Id.*

Other federal courts have also rejected attempts to characterize Unison's HomeOwner Agreement and similar agreements as "credit" or a loan. *See Goldwater Bank, N.A. v. Elizarov*, No. 21-00616, 2022 WL 18231680, at *1 n.14 (C.D. Cal. Dec. 12, 2022) (dismissing claim that Unison concealed the nature of a transaction as being a loan, noting that "[w]hile Elizarov refers to Unison's 'lending program,' the materials that Elizarov himself provides [which were HomeOwner Agreement documents similar to Appellants' here] make clear that the Option Agreement was not a loan"); *Foster v. EquityKey Real Est. Invs. L.P.*, No. 17-00067, 2017 WL

1862527, at *4 (N.D. Cal. May 9, 2017) (holding that an option to participate in the appreciation of property is "not a loan" for purposes of TILA).

The *Foster* case is instructive. As Unison did here, EquityKey paid the plaintiff to purchase an option to participate in a property's future value, which was secured by a deed of trust securing performance obligations. 2017 WL 1862527, at *1–2. The plaintiff sued under TILA, arguing EquityKey fraudulently concealed that its agreement was a loan. *Id.*, at *2. The court disagreed, pointing to the fact that the *Foster* plaintiff owed no debt and "there [was] no guarantee that the payment received by [plaintiff] need ever be returned," considering that EquityKey "[was] not obliged to exercise its option." *Id.*, at *4–5. Like here, because the plaintiff in *Foster* "did not agree to 'repay absolutely,'" the option was "not a loan." *Id.*, at *4 (quoting *In re Grand Union Co.*, 219 F. 353, 356 (2d Cir. 1914)). The Olsons attempt to distinguish *Foster* on the ground that the plaintiff sought relief under TILA and California law rather than Washington law. Op. Br. at 38. As explained above, however, there is no reason to believe the Washington Legislature intended to adopt an idiosyncratic definition of "credit" that departs from both the federal definition and the common understanding of that term.

Appellants' attempt to distinguish *Foster* also conflicts with the Washington Legislature's direction that, "[i]n interpreting and applying the CPA, courts are to be guided by all 'relevant federal precedent.'" NWCLC Br. at 4; *see* RCW § 19.86.920.

The Washington Supreme Court has also endorsed the consideration of "decisions from other jurisdictions" in determining whether a practice violates the CPA. *See Schiff v. Liberty Mut. Fire Ins. Co.*, 542 P.3d 1002, 1008–09 (Wash. 2024) (en banc) (citing decisions under Illinois and Delaware law as "support[]" for the Court's conclusion that insurance practice was not "unfair or unreasonable" and thus did not violate the CPA).

Recent Washington legislative activity also confirms that the HomeOwner Agreement is not a "loan" subject to regulation under the Consumer Loan Act. In January 2024, bills were proposed in both the Washington House and Senate which would "regulat[e] home equity sharing agreements under the consumer loan act." *Supra* p. 13. Appellants' counsel and both *amici* participated in this state legislative process, urging the House to pass "legislation" that "would regulate home equity sharing agreements under the Consumer Loan Act and place them under the authority of the DFI" because "[t]here are no current regulations or limits for these financial instruments." H.B. Rep. on H.B. 2081, at 3, 68th Leg., Reg. Sess. (Wash. 2024); *see also* S.B. Rep. on S.B. 5968, at 2, 68th Leg., Reg. Sess. (Wash. 2024) ("HESAs [home equity sharing agreements] are not currently covered under the Washington Consumer Loan Act.").

Whether to "take some action or institute some process" for home equity sharing agreements like the HomeOwner Agreement is for the Washington

26

Legislature to decide. *See Meyer v. Nw. Tr. Servs. Inc.*, 712 F. App'x 619, 631 (9th Cir. 2017); *see also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194–95 (1978) (under our tripartite system of government, "it is . . . the exclusive province" of the legislature "to formulate legislative policies" and "establish their relative priority"). In the meantime, the Court must apply the law as written. *See Tenn. Valley Auth.*, 437 U.S. at 194–95.

Appellants' efforts to shoehorn an option contract into the definition of a reverse mortgage loan are unpersuasive. For example, Appellants make much of the fact that, under Washington law, a reverse mortgage loan may include a "shared appreciation" component. *See* RCW § 31.04.505(5). More generally, in a "shared appreciation mortgage[]" ("SAM"), a "lender may give the borrower a lower interest rate, lower down payment, or another form of assistance in exchange for an agreed-upon percentage of the home's appreciation." *Product Spotlight: Shared Appreciation Mortgages*, Wash. State Dep't of Fin. Insts., https://dfi.wa.gov/newsletter/winterspring-2023-cs-newsletter/product-spotlight-shared-appreciation-mortgages (last visited Apr. 15, 2024). But the fact that it is permissible to have a shared appreciation component in reverse mortgage loans does not mean that all contracts resulting in shared appreciation are reverse mortgage loans – the requirement that there must be a loan or "credit" remains regardless of whether a contract has a shared equity component or not. Indeed, as DFI

acknowledges on its website, only "SAMs or similar products that meet the definition of a loan must be licensed under the [Consumer Loan Act]" and "comply with the disclosure requirements for SAMs or mortgages with shared appreciation provisions." *Id.*

Next, Appellants and DFI argue that the Option should be treated like a mortgage loan under the Consumer Loan Act on the ground that another agreement between the Olsons and Unison, a Deed of Trust, "is subject to all laws relating to mortgages" under the Deed of Trust Act. RCW § 61.24.020; Op. Br. at 35; DFI Br. at 9. But the argument rests on a fundamental misunderstanding of the distinction between a mortgage, *i.e.*, a lien on real property, and a mortgage <u>loan</u>, *i.e.*, a loan secured by a mortgage.

Under Washington law, a deed of trust is simply an instrument used to "secure the performance of an obligation." *Diaz v. N. Star Tr., LLC*, 16 Wash. App. 2d 341, 362 (2021). Here, the Deed of Trust secures the homeowner's obligations for items like reimbursement for any unpaid property taxes Unison may extend to protect the property if the homeowner fails to do so. ER-136–37, § 2(b).[16] In Washington, "[a] deed of trust creates a lien on real property." *Hummel v. Nw. Tr. Servs., Inc.*, 180 F.

---

[16] The Deed of Trust explicitly does <u>not</u> secure repayment of Unison's $64,750 Initial Payment to the Olsons. *See* ER-138, § 2(f) ("Grantor shall not be obligated to repay any part of the Unison Investment Payment . . . and therefore, such item shall not be included within the Obligations").

Supp. 3d 798, 810 (W.D. Wash. 2016), *aff'd*, 740 F. App'x 142 (9th Cir. 2018). A "mortgage" likewise "creates nothing more than a lien." *White v. Mortg. Elec. Registration, Inc.*, No. 17-0906, 2017 WL 2574014, at *2 (W.D. Wash. June 14, 2017). In effect, "a deed of trust is a species of mortgage." *Deutsche Bank Nat'l Tr. Co. v. Slotke*, 192 Wash. App. 166, 172 (2016). It is thus not surprising that a deed of trust is "subject to all laws relating to mortgages" set forth in the Deed of Trust Act. RCW § 61.24.020.

However, a "mortgage" is not a "mortgage <u>loan</u>," and the "laws relating to mortgages" in the Deed of Trust Act are not the laws relating to "residential mortgage <u>loans</u>" in the Consumer Loan Act. As noted above, a mortgage is simply a "lien." In contrast, a "residential mortgage <u>loan</u>" is a "<u>loan</u> . . . secured by a mortgage, deed of trust, or other consensual security interest on a dwelling, as defined in the truth in lending act." RCW § 31.04.015(24) (emphasis added); *see also* RCW § 19.144.010(11) ("'Residential mortgage loan' means an extension of <u>credit</u> secured by residential real property . . .") (emphasis added). The "laws relating to mortgages" in the Deed of Trust Act govern the process for conducting a nonjudicial foreclosure. *Meyer*, 712 F. App'x at 628. Those laws have no relevance here. Among other things, the Olsons have not alleged that they breached any of their contractual obligations under the HomeOwner Agreement, such as their preexisting obligation to pay real estate taxes on their property. In any event, whether

the Deed of Trust is subject to the foreclosure process in the Deed of Trust Act has no bearing on whether the HomeOwner Agreement is a reverse mortgage loan under the Consumer Loan Act.

Finally, the argument that the Option is only not a "reverse mortgage loan" because of some technicalities is inaccurate. In non-legalese, a reverse mortgage loan is "a loan where borrowed money + interest + fees each month = rising loan balance." *What is a reverse mortgage?*, Consumer Fin. Prot. Bureau (Aug. 28, 2023), https://www.consumerfinance.gov/ask-cfpb/what-is-a-reverse-mortgage-en-224/. "With a reverse mortgage loan, the amount the homeowner owes to the lender goes up . . . because interest and fees are added to the loan balance each month." *Id.* The loan is then "repaid when the borrower no longer lives in the home." *Id.* This basic description does not fit the Option. Under the Option, there is *never* any interest, *never* any monthly fees, *never* any loan balance, and *never* any debt. These are not technicalities but rather elements of a fundamentally different type of economic transaction.

Appellants narrowly focus on the risks of loss to the reverse mortgage lender in a falling market. *See* Op. Br. at 7, 25 (arguing that a non-recourse reverse mortgage "lender . . . cannot recoup more than the value of the individual's home" and thus could lose money "[i]f the home drops precipitously in value."). But option economics are markedly different from a reverse mortgage loan. In a non-recourse

30

reverse mortgage loan situation, a "precipitous[]" drop in value does not absolve the borrower of their repayment obligations or extinguish their debt; it merely limits the lender's remedy for non-payment to foreclosure (and any governmental funds or insurance available to protect the lender in such a situation). *See* Restatement (Third) of Property (Mortgages) § 1.1 (1997); *James B. Nutter & Co. v. Estate of Murphy*, 478 Mass. 664, 665–66 & n.4 (2018).[17] In contrast, if the value of the Olsons' property drops "precipitously," such as in the scenario posited by Appellants (Op. Br. at 7), Unison would not exercise the Option, there would be no further obligations between the parties, and Unison would suffer an unprotected loss.[18] In that circumstance, the Olsons would keep the $64,750 initial payment they received in exchange for granting the Option and Unison would receive nothing.

In sum, the Washington Consumer Loan Act defines a reverse mortgage loan as "credit" with certain characteristics. RCW § 31.04.505(5). The HomeOwner Agreement is not "credit": no loan was intended here and, in fact, was expressly and

---

[17] To incentivize private lenders to offer reverse mortgage loans, Congress created an insurance program to compensate lenders for losses if an outstanding balance is not repaid or covered by sale of the home. *See Bennett v. Donovan*, 703 F.3d 582, 585 (D.C. Cir. 2013); *Plunkett v. Castro*, 67 F. Supp. 3d 1, 6 (D.D.C. 2014); 12 U.S.C. § 1715z-20.

[18] In the hypothetical proposed by Appellants, where an Exercise Event occurred after "the value of the home dropped by 60%," Op. Br. at 7, the Olsons' home would be valued at $148,000. Because a 70% interest ($103,600) would be worth less than the $194,250 second payment Unison would have to make to exercise the option, it would not exercise the Option.

accurately disclaimed; Unison has no right to any specified payment or return of the Initial Payment; and, indeed, Unison has no vested right to receive anything at the time of making the Initial Payment (and may never have a right to *any* future payment if property values decline significantly). Thus, the Consumer Loan Act does not apply.

Because the HomeOwner Agreement is not subject to the Consumer Loan Act, the District Court properly dismissed the Olsons' per se CPA claim predicated on a violation of the Consumer Loan Act. *Est. of Brantner v. Ocwen Loan Servicing LLC*, 799 F. App'x 553, 554 (9th Cir. 2020) (holding CPA claim must be dismissed where "the three provisions of the CLA that served as the basis for the Estate's per se CPA claim are inapplicable as a matter of law"); *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1065 (9th Cir. 2009) (per se CPA claim predicated on the Commercial Electronic Mail Act ("CEMA") was properly dismissed where plaintiff could not state a CEMA claim).

### D.     The Equitable Mortgage Concept Advanced by DFI Does Not Apply Here.

Because they acknowledged that the HomeOwner Agreement does not meet the statutory requirements of a reverse mortgage loan, the Olsons' Complaint and their arguments to the District Court focused on an equitable recharacterization theory. *See* ER-215, 217–19, 225–27; ER-36–37, 47–51. In an implicit concession to the correctness of the District Court's decision, there is barely a reference to this

lynchpin theory in Appellants' briefing to this Court. *Compare id.*, *with* Op. Br. at 36–37. With Appellants having failed to support the premise of the Complaint—*i.e.*, the only issue before this Court—the DFI filed an *amicus* brief parroting what the Olsons argued below. But the DFI's argument has no more merit at this stage of the proceedings than when it was rejected by the District Court.

    The DFI contends that, even if the Homeowner Agreement does not "meet[] the statutory definition of residential mortgage loans," the agreement should nonetheless be "regulat[ed]" like one through the CPA, under an "equitable mortgage" theory. DFI Br. at 11. In support, the DFI cites cases from 1942 and 1913 purportedly establishing that the Option can be rebranded as an "equitable reverse mortgage loan." The cases show no such thing.

    To begin, there is no case recognizing an "equitable <u>reverse</u> mortgage loan" under any circumstances. That concept does not exist in the law. Instead, DFI cites *Hoover v. Bouffleur*, 74 Wash. 382 (1913) and *Phillips v. Blaser*, 13 Wash. 2d 439 (1942), as purported support for an equitable mortgage theory. These cases applied equity in quiet title or eviction proceedings to deem sales transactions to be mortgage loans where the transactions were documented as below-market sales at the amount needed by the landowners to avoid foreclosure or default with a short-term ability to re-purchase properties at a much higher price. As a corollary to that application of

equity, in each case the filed deed of sale was deemed an "equitable mortgage" instead of the conveyance of title it appeared to be on its face.

In both cases, an owner of real property explicitly sought a loan from another individual to alleviate the distress on a piece of real property. The individual from whom the loan was sought required an abusive structure whereby the property would be "sold" at an amount equal to just what was needed to cure the immediate distress on the property, with the owner retaining a right to repurchase the property in one to three months at a substantially higher price. In both cases, the sellers did not possess funds necessary to execute the repurchase, and the predictable net result of the transactions was that Phillips sold a property worth at least $4,000 for $299.60 and Hoover sold a property worth over $4,000 for $250. The *Phillips* court explained the equitable concerns in these extreme circumstances:

> [A] mortgagor cannot through any device bargain away his right of redemption at the time of giving the mortgage; [] while a mortgagor may release his equity of redemption to the mortgagee by subsequent agreement, the courts look upon such agreements with distrust and if it appear that the mortgagee took advantage of the necessities of the mortgagor, or that the consideration for such release of the mortgagor's equity of redemption is grossly inadequate, the release will be disregarded and the original relationship of the parties held to continue.

13 Wash. 2d at 445. In other words, as explained in one of the cases cited by Appellants, three circumstances must be present to invoke the equitable mortgage concept to find a loan where there otherwise is none: "(1) a sale with an option to repurchase, (2) a large disparity between the amount of indebtedness and the value

of the property, and (3) a party motivated by severe financial pressure to seek funds."
*Hernandez v. Carpenter*, No. 59952-6, 2008 WL 4839658, at *5 (Wash. Ct. App. Nov. 10, 2008). In that scenario, a court acting in equity may recharacterize the putative supposed "sale" in the distressed circumstances to be a loan to prevent the "buyer" from receiving the entire value of the property for a pittance based on the "seller's" desperation and inability to buy the property back in a few months.

This case differs from *Hoover* and *Phillips* in numerous respects. First and most obviously, the sales in *Hoover* and *Phillips* were sham transactions to address an emergency regarding the financing of the property—no one would sell a $4,000 property for $250. By contrast, the Option is a serious transaction with many uses, such as for home renovations (the demonstrated value of the added improvements are excluded from appreciation), paying off other debt, starting a business, or making a large purchase. It is also an option, through and through. The Olsons granted Unison a 30-year option to purchase a 70% undivided interest in non-distressed real property with total compensation to the Olsons under the option equal to 70% of the then-current agreed appraised value (excluding time value of money).[19] Whether the Option will have any economic value in the future at the time of one of the specified

---

[19] Per the Option, the Agreed Value of the Property in March 2019 was $370,000. To acquire 70% of the Property, Unison would have to pay a total sum of $259,000 (the initial payment of $64,750 plus a second payment of $194,250 at option exercise), which is 70% of the $370,000 Original Agreed Value. ER-80–81, §§ 1, 4.

triggering Exercise Events—none of which are in Unison's control—is an open question. There was no short-term sale-repurchase dynamic (set at a price keyed to an amount needed to avoid foreclosure or otherwise) plainly destined to lead to the "seller's" loss of his property for virtually no consideration. The equitable concerns, and extreme circumstances, present in the cases cited by the DFI and the Olsons do not even begin to apply here.

Further, the proper inquiry always remains what the parties intended. *See Phillips*, 13 Wash. 2d at 447 (whether a deed should be construed as a loan depends upon the intention of the parties); *Johnson v. Nat'l Bank of Com. of Tacoma*, 65 Wash. 261, 268–70 (1911) ("the intention of the parties . . . is controlling"). Specifically, as DFI concedes, to overcome the transaction documents, the party seeking recharacterization of a sale as an equitable mortgage loan must make a showing "by clear and convincing evidence" that the parties actually intended to form a loan. *Phillips*, 13 Wash. 2d at 447; *Johnson*, 65 Wash. at 269; DFI Br. at 12. Yet, here, there is no allegation that the parties discussed a loan, no allegation that Unison suggested the agreement would function as a loan, the structure is not that of a loan, and the offer documents do not mention a loan. To the contrary, the offer documents from Unison make clear that, "[i]f you accept our Offer, you will grant Unison . . . an Option to purchase a [70.00%] interest in your home." ER-164. In addition, the Option itself explicitly states that the initial payment is not a loan or

indebtedness, nor is it a principal amount which Unison is entitled to recover at any time. ER-82, § 6. There is no evidence—let alone "clear and convincing evidence"—the parties intended the Option to be a loan. The evidence is firmly to the contrary.

Finally, to invoke equity, the benefiting party must have no adequate remedy at law and face irreparable injury without equitable relief. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Indeed, the equitable mortgage cases cited by DFI and Appellants involved the loss of a specific parcel of real property and were quiet title or eviction proceedings—a paradigmatic irreparable injury situation. Using equity to spawn a claim for damages under a statute that does not otherwise apply—a request to assess treble damages no less—is far beyond the proper application of equitable principles.

## II.    The District Court Correctly Held that Unison's Marketing of the HomeOwner Agreement is Not Unfair or Deceptive.

The Olsons' second and third claims allege that Unison's "marketing and selling" of the HomeOwner Agreement is unfair and deceptive under the CPA. ER-228–29, ¶¶ 7.3, 8.3. A "deceptive" practice is one that has "the capacity to deceive a substantial portion of the public," *Hangman Ridge*, 105 Wash. 2d at 785, because it "is likely to mislead' a reasonable consumer." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wash. 2d 27, 50 (2009) (en banc). An "unfair" practice is one that "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by

consumers themselves and not outweighed by countervailing benefits." *Klem v. Wash. Mut. Bank*, 176 Wash. 2d 771, 787 (2013) (en banc). Whether a practice is unfair or deceptive is a question of law. *Meyer*, 712 F. App'x at 627–28. In addition to showing that a practice is unfair or deceptive, stating a CPA claim requires a plaintiff to plead "a causal link between the alleged acts and the plaintiff's injury." *Hangman Ridge*, 105 Wash. 2d at 793.

The Olsons do not adequately allege any practices that were "deceptive" or "unfair."

## A. Unison Did Not Engage in Any Deceptive Practices.

The Olsons do not allege any "deceptive" practices. To the contrary, the Complaint makes clear that all of Unison's statements were factually true and not misleading.

The only "marketing and selling" the Olsons allege in the Complaint is the receipt of a "flyer in the mail" that "promised that the Olsons could 'access the equity locked in [their] home' by entering into an agreement with Unison that would include 'no monthly payments and no interest.'" ER-220, ¶ 4.38. The Olsons also contend that describing the HomeOwner Agreement as "not a loan" is "deceptive" on the ground that it is "functionally a reverse mortgage loan." ER-229, ¶ 8.3.

The statements from Unison, however, are true and not deceptive. As to the statement that the Option "would include 'no monthly payments and no interest,'"

there are in fact no monthly payments or interest. <u>This is undisputed.</u> As the Olsons themselves allege, any obligations arise "under the terms of the HomeOwner Agreement only after a borrower either dies, sells their home, ceases to occupy the home as their primary residence, or at the expiration of a 30-year term." ER-218, ¶ 4.22; *see also* DFI Br. at 4 ("Instead of charging interest," Unison receives an option for "a share in the increased value of a home"). As to statements from Unison that the Option is not a loan, as explained above, the Option is <u>not</u> a loan. Thus, it was not deceptive for Unison to say that the Option is in fact <u>not</u> a loan. The statement is, again, true.

It is worth noting that the District Court granted the Olsons leave to amend when their Complaint was dismissed. ER-6–7. The Olsons declined. Instead of amending the Complaint to attempt to state a claim, they "request[ed] the Court enter judgment consistent with its ruling on the motion to dismiss." SER-3. Yet the Olsons now assert an entirely new theory of alleged deception on appeal.

Though not pled (*see* ER-214–33) or argued below (ER-29–56), the Olsons now contend on appeal that the Unison flyer is misleading because the HomeOwner Agreement "requires regular payment of various costs" which could, if not paid in accordance with the parties' agreement, "lead[] to interest-accruing debts with Unison." Op. Br. at 48. Appellants appear to be referring to the continuing obligation

of homeowners to "pay for taxes, insurance, and repairs on the home." *Id.* at 17, 50–52. The Court should hold these new arguments to be forfeited.

In any event, they fail on their merits. As a preliminary matter, the Olsons do not allege they believed the "no interest charges" and "no monthly payments" statements on the flyer to be a promise that, if they entered into a HomeOwner Agreement, they would no longer be responsible for ordinary ongoing commitments of homeownership, such as property taxes, homeowners' insurance, or home maintenance. *See* ER-219–20. In fact, they do not allege the statements they now challenge had any impact whatsoever on their decision to apply for a HomeOwner Agreement. *Id.* Rather, the Olsons allege that, "[b]ecause they needed money and didn't think refinancing their home again was feasible at that time, [they] decided to apply for a HomeOwner Agreement to obtain cash." ER-220, ¶ 4.39.[20]

A plaintiff asserting a CPA claim "may only recover for injuries that they demonstrate were proximately caused by a defendant's unfair or deceptive practices." *Meyer*, 712 F. App'x at 633. Yet, here, the Olsons do not allege that "but for" the "no interest charges" and "no monthly payments" language on the flyer they would not have entered into a HomeOwner Agreement. *See Indoor*

---

[20] This statement from the Olsons is telling. It confirms they understood the HomeOwner Agreement was not debt refinancing or a loan, which they did not believe to be "feasible" for them. *See* ER-220, ¶ 4.39.

40

*Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*, 162 Wash. 2d 59, 83 (2007) (en banc). Because they do not plead causation, the Olsons cannot state a CPA claim with respect to flyer statements they now seek to challenge. *See, e.g.*, *Gray v. Amazon.com, Inc.*, No. 22-800, 2023 WL 3204074, at *3 (W.D. Wash. May 2, 2023) (dismissing CPA claim because plaintiffs "failed to plead that the [allegedly deceptive] statements caused their alleged injuries"); *Young v. Toyota Motor Sales, U.S.A.*, 196 Wash. 2d 310, 322 (2020).

In addition to failing to allege the statements caused them injury, the Olsons' CPA claim fails because it "defies common sense" that the challenged language would deceive "a reasonable consumer." *See Davis v. HSBC Bank Nev. N.A.*, 691 F.3d 1152, 1162 (9th Cir. 2012). It is not plausible that the statements "No interest charges. Unlike a home equity loan or home equity lines of credit, you'll pay no interest with Unison" and "No monthly payments. Use the money now, for up to 30 years, and pay nothing until you decide to sell" (ER-28) "would lead a rational consumer to conclude" that entering into a HomeOwner Agreement would relieve them of the ordinary costs of homeownership, such as property taxes or homeowners' insurance. *See Davis*, 691 F.3d at 1162. That makes no sense at all.

In addition, while it is illogical that a reasonable consumer would conclude that selling Unison an option would stop preexisting payment obligations such as real estate taxes or home insurance, the mailer does not even state that third party

payments would end (as the Olsons' new theory alleges). The mailer only states that the homeowner will "make no payments to <u>us</u> [i.e., Unison] until you sell." ER-28 (emphasis added).[21]

The implausible theory that reasonable homeowners would conclude they could stop paying for fundamental and preexisting homeownership obligations, such as taxes and insurance, after entering into a Homeowner Agreement is even more incredible given that anyone contemplating a HomeOwner Agreement must first review and sign documentation that both describes the agreement in detail and urges them to consult with advisors before entering into the agreement with Unison. *Supra* pp. 4–5.

---

[21] Appellants rely on a press release announcing a CFPB consent order against a different company, Nationwide Equities Corporation ("NWEC"), as purported evidence of deception. But the letters and flyers sent by NWEC advertised its product as "TAX FREE" and promised to "eliminate[] monthly mortgage payments." Consent Order, ¶¶ 26-27, *In the matter of Nationwide Equities Corp.*, File No. 2021-CFPB-0002 (Apr. 27, 2021). They also "misrepresented that [NWEC] was offering a loan associated with the consumer's current lender that originated the consumer's current reverse mortgage loan" and stated "NWEC offered a product that would allow a consumer to make changes to her current reverse mortgage, rather than taking out a new mortgage credit product." *Id.* ¶¶ 37–58. "In reality, NWEC was offering an entirely new loan, not a modification or 'update' of the borrower's existing reverse mortgage loan from the borrower's current lender." *Id.* ¶ 50. Letters also "misrepresented that a reverse mortgage loan refinance was 'due' for the borrower-recipient" and "misrepresented that taking out a second reverse mortgage would result in substantial savings to the consumer." *Id.* ¶¶ 66, 73. The NWEC situation is not like this case.

In *Davis*, for example, this Court held that it was not reasonable for a plaintiff to "put faith" in an advertisement that allegedly hid the existence of an annual credit card fee where, before obtaining the credit card, the consumer was required to scroll through an "Important Terms & Disclosure Statement" that disclosed the annual fee. 691 F.3d at 1163–64; *see also Lavis v. Reverse Mortg. Solutions, LLC*, No. 17-209, 2018 WL 2171444, at *6 (S.D. W. Va. May 9, 2018) (dismissing claim alleging plaintiff "construed [a] statement that she would not have to make house payments to mean she would not have to pay for insurance" where "she signed documents informing her that she would be responsible for maintaining insurance and paying her property taxes").

Appellants contend the District Court erred by giving credence to other documents the Olsons reviewed and signed, such as a warning that those considering a HomeOwner Agreement should "**discuss[] the Unison HomeOwner Agreement with your own advisors (legal, financial, estate planning, tax)**" and "consider other financial alternatives available to you, as well as the risks associated with this transaction." ER-169. Yet it is well-settled that a reasonable consumer is not free to ignore disclaimers or qualifying language. *See Freeman v. Time, Inc.*, 68 F.3d 285, 289–90 (9th Cir. 1995). Appellants complain this bolded and underlined language is "buried in a whole series of documents," Op. Br. at 54, while ignoring the Olsons signed the "ACKNOWLEDGMENT AND SIGNATURE" page promising they had

43

not only "received a copy of this **Important Information Notice**" but "have read and understand it." ER-174.

The Olsons do not allege that the flyer's "no monthly payments" and "no interest" language is likely to deceive a reasonable consumer, or that they personally suffered any injury as a result of the language they now seek to challenge. Their third CPA claim fails for both reasons.

### B. The HomeOwner Agreement Is Not Unfair.

In addition to challenging the Unison flyer as deceptive, Appellants now contend that the HomeOwner Agreement is, itself, "unfair." An "unfair" practice is one that "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits." *Klem*, 176 Wash. 2d at 787 (quoting 15 U.S.C. § 45(n) and explaining that, in construing the CPA, the Legislature "instructed courts to be guided by federal law in the area"). "In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *Davis*, 691 F.3d at 1168. "An injury is reasonably avoidable if consumers have reason to anticipate the [purported] harm and the means to avoid it." *Id.* (citation omitted); *Gray v. Amazon.com, Inc.*, 653 F. Supp. 3d 847, 858 (W.D. Wash. 2023) (citation omitted).

Appellants cannot establish that the HomeOwner Agreement is "unfair" because consumers can "reasonably avoid" any potential injury by simply choosing not to enter into an agreement with Unison. The decision whether to sell an option to Unison is up to the homeowner, and the terms of the transactions are clearly explained beforehand. Here, similarly to the *Davis* case decided by this Court, an applicant is required to "**Read Carefully**" an "IMPORTANT INFORMATION NOTICE" that not only clearly describes the HomeOwner Agreement but also directs them to "discuss[] . . . the HomeOwner Agreement with your own advisors (legal, financial, estate planning, tax) and family members" and "consider other financial alternatives available to you, as well as the risks associated with this transaction." ER-169.

Before receiving the HomeOwner Agreement documents for execution, an applicant must sign an Acknowledgment promising that they had "read and understand" the "**Important Information Notice**," as the Olsons did here. ER-174. A consumer thus has both "reason to anticipate" the nature of the transaction and, because they can "abort[] [the] application] upon reading the terms and conditions," "the means to avoid the alleged harm." *Davis*, 691 F.3d at 1169; *see also Gray*, 653 F. Supp. 3d at 859 ("In light of Amazon's disclosures, consumers would have 'reason to anticipate' their injury and 'the means to avoid it' – *i.e.*, by reviewing the Alexa Terms and declining to purchase and use an Alexa enabled device").

Though that should be the end of the inquiry, Appellants' argument also fails because the HomeOwner Agreement offers "countervailing benefits." *Klem*, 176 Wash. 2d at 787. Indeed, Appellants concede that shared equity products "provide value to homeowners in need of cash," Op. Br. at 40, as the Olsons allege they were. ER-220, ¶¶ 4.36–4.39. Others may like the risk profile of selling an option to Unison because they desire protection from the risks of a falling market. *See supra* pp. 8, 10–11. Unison's option product offers multiple quality "countervailing benefits" to the concerns expressed by Appellants and *amici*, as their own cited sources indicate.[22]

---

[22] *See, e.g.*, Sam Brittingham, *Aging Out of Place: The Toll of Reverse Mortgages and How to Fix the Program*, 29 Eld. L. J. 149, 155–58 (2021) (describing the challenges individuals on a fixed income, such as seniors, face in obtaining a home equity loan or HELOC and explaining that equity sharing is "an interesting and useful wealth management tool" that "has been helpful"); Sarah B. Mancini & Odette Williamson, *Reversing Course: Stemming the Tide of Reverse Mortgages Foreclosures Through Effective Servicing and Loss Mitigation*, 26 Elder L.J. 85, 85–86 (2018) (explaining that programs allowing homeowners "to liquidate their home equity" can provide "crucial safety net[s] for older adults" by allowing "seniors to bridge the financial gap between income and expenses and to remain in their homes and communities"); *see also, e.g.*, FHA: Strengthening the Home Equity Conversion Mortgage Program, 82 Fed. Reg. 7094, 7094 (Jan. 19, 2017) (to be codified at 24 C.F.R. pts. 30, 206) (explaining that the U.S. Department of Housing and Urban Development's "Home Equity Conversion Mortgage Program," which "enables seniors who have equity in their homes to withdraw a portion of the accumulated equity" is intended to "ease the financial burden on elderly homeowners facing increased health, housing, and subsistence costs at a time of reduced income").

In fact, the utilization of shared equity concepts in Unison's HomeOwner Agreement mitigates the long-time frustration of governmental organizations regarding the perceived failure of lenders to adequately offer shared equity provisions such that lenders could offer loans at lower interest rates and/or with smaller or no downpayment requirements. Regulators and governmental organizations, such as the United States Department of Housing and Urban Development (HUD), Fannie Mae, and the California state government, have repeatedly pressed for lenders to include shared appreciation components in loan products to make loans more affordable and/or available.[23] Unison's option product is not a loan, but the shared appreciation feature of its option product provides this benefit that the government has been pushing for.

---

[23] *See* FHA: Strengthening the Home Equity Conversion Mortgage Program, *supra* n.22, at 7094 (issuing final rule authorizing shared appreciation and rejecting comments that shared appreciation should not be utilized because it is a negative for homeowners); *Selling Guide Announcement (SEL-2023-04)*, Fannie Mae (May 23, 2023), https://singlefamily.fanniemae.com/media/35881/display (reaffirming Fannie Mae's support for three types of shared equity programs and changing the rules so that additional home purchasers are eligible and the shared appreciation programs can be made more broadly available); *California Dream For All: A Proposed Shared Appreciation Loan Investment Fund For The State of California*, California State Treasurer's Office (June 6, 2022), https://www.treasurer.ca.gov/publications/ca-dream-for-all-report.pdf (California treasurer advocating for California to spend $10 billion on a shared appreciation program because lenders are not sufficiently offering shared appreciation; program was subsequently approved by the legislature and governor and is being operated by the California Housing Finance Agency).

Appellants do not argue they satisfy the legal requirements for an "unfair" practice. Instead, they urge the Court to deem the HomeOwner Agreement "unfair" based on the option product's asserted similarity to reverse mortgage loans, citing *Panag v. Farmers Insurance Co.* But *Panag* addressed "deceptive" practices, not "unfair" practices. The court there held that payment demands designed to "look like debt collection notices" were "deceptive" under the CPA because they "may induce people to remand payment in the mistaken belief they have a legal obligation to do so when in fact the notices represent nothing more than an unadjudicated claim for tort damages." 166 Wash. 2d at 47. Indeed, the court's ruling hinged on the fact that the practice was "deceptive" as opposed to "unfair." *Id.* at 51 (emphasizing that the plaintiffs did not need to satisfy "the 'reasonably avoided' test" because that test "does not apply to 'deceptive,' as opposed to 'unfair,' acts or practices"). *Panag* did not address whether or when non-deceptive practices that do not violate a statute might be "unfair" under the CPA.[24]

To sum up, there is nothing unfair about offering a financial product with full disclosure of its terms and conditions and warnings that consumers should consult

---

[24] The same is true of *State v. Kaiser*, 161 Wash. App. 705, 722 (2011), which involved a defendant who "withheld material information" from homeowners facing foreclosure, "induced them to enter into agreements that misrepresented material facts" by promising to help them avoid foreclosure, and hired attorneys purporting to represent the homeowners who would then conceal funds from the homeowners and give them to the defendant.

their advisors and consider alternative products before entering into an agreement. *Cf. Haywood v. Amazon.com, Inc.*, No. 22-01094, 2023 WL 4585362, at *7 (W.D. Wash. July 18, 2023) ("exercising a right that a contract permits and is fully disclosed to the parties in advance is not an unfair or deceptive act or practice" under the CPA). Indeed, what would be unfair is imposing liability on Unison for conduct that the Legislature expressly excluded from regulation by defining a "reverse mortgage loan" as "a nonrecourse consumer <u>credit</u> obligation." RCW § 31.04.505(5) (emphasis added); *see Restaurant Dev.*, 150 Wash. at 682 (citation omitted) (statutes must be construed "such that all of the language is given effect, and no portion is rendered meaningless or superfluous").

While Appellants ask the Court to expand the regulatory landscape in a manner they view as "in [the] public interest," *see* Op. Br. at 45, Washington's highest court has urged caution in judicial expansion of legislation under the guise of "liberally constru[ing]" the CPA. As the Washington Supreme Court explained:

> There is a marked difference between the judicial and legislative processes of inclusion and exclusion of activities under the Consumer Protection Act. In the legislative process, the people engaged in the activity sought to be specifically included within the act have the full opportunity to be heard and to have their particular problems considered at legislative hearings. Furthermore, the merits of any such proposed inclusion are subject to debate and amendment in legislative committees and on the floor of the respective houses of the Legislature. The judicial process, on the other hand, does not always provide equivalent opportunities.

*State v. Schwab*, 103 Wash. 2d 542, 547–48 (1985) (en banc) (declining to allow the CPA to be used "as a vehicle for enforcing tenants' rights as those rights are established by the Residential Landlord-Tenant Act").

Holding that Unison's practice is "unfair" would raise due process and separation-of-powers concerns. The Legislature enacted a statute that, by its express terms, applies only to credit obligations and not to other types of transactions such as option agreements. The Court should not regulate a practice that the Legislature expressly chose not to regulate by declaring that practice "unfair." Such a holding would not only be unfair to Unison, which followed the express terms of the law in good faith, but it would also be unfair to the Legislature, whose decision not to regulate home equity sharing agreements through the Consumer Loan Act should be respected.

Indeed, the legislative process described in *Schwab* is underway. House and Senate bills have been proposed, debated, and revised. *Supra* pp. 13–14. Public hearings have been held, including participation of Appellants' counsel, *amici*, Unison, and others. *Supra* pp. 14–15. Neither of the proposed bills passed during the last legislative session. *Supra* p. 15. The Legislature will return again, no doubt to bills addressing regulation for home equity sharing agreements. The legislative process should be permitted to run its course, rather than retroactively changing the

regulatory scheme to impose substantial damages on a company that dutifully followed existing law.

### III. There is No Compelling Reason for Certification and this Court is Well Suited to Decide the Issues Raised on Appeal.

Certification to the Washington Supreme Court is authorized when "necessary to ascertain the local law of [Washington] in order to dispose of [a] proceeding and the local law has not been clearly determined." RCW § 2.60.020. The decision to certify a question is within the "sound discretion" of this Court, *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974), but may be "appropriate where a case presents 'complex' issues of state law with 'significant policy implications.'" *Pacheco v. United States*, 21 F.4th 1183, 1187 (9th Cir. 2022) (citation omitted). For example, in Appellants' cited cases, this Court asked state supreme courts to opine on whether "the right to intrastate travel in Washington [is] protected under the Washington State Constitution," *Potter v. City of Lacey*, 46 F.4th 787, 789 (9th Cir. 2022), and "whether Hawaii's general long-arm statute incorporates the federal Due Process Clause," *Yamashita v. LG Chem, Ltd.*, 48 F.4th 993, 997 (9th Cir. 2022).

This case is a poor candidate for certification because the Olsons' CPA claims are based on fact-specific allegations. Appellants contend that the particular characteristics of Unison's contracts render them "reverse mortgage loans" under Washington law. They further complain that the particular characteristics of Unison's marketing materials constitute "deceptive" or "unfair" practices.

51

Appellants contend, for example, that particular language in Unison's flyer is deceptive in view of particular provisions of Unison's agreement. Op. Br. 49–50. These case-specific contentions are not the types of fundamental questions of state law that warrant certification.

Significantly, Appellants insist that "this issue will likely never be resolved in Washington state court" on the theory that "[b]ecause Unison is not a Washington company but sells policies to Washington homeowners, the company will almost always be able to remove any case in state court to federal court." Op. Br. 57. As this argument underscores, the "issue" in this case is whether *Unison*'s contract and marketing are "deceptive." Although a case involving a Washington-based business that sells option contracts may not be removed and thus could reach the Washington Supreme Court, Appellants' theory is that such a case would present a different issue because it would not involve Unison-specific facts. And the question of whether one specific product from one particular business—Unison—is violating Washington law does not present the type of consequential question warranting certification.

Moreover, of relevance here, "[t]here is a presumption against certifying a question to a state supreme court after the federal district court has issued a decision," because "[a] party should not be allowed a second chance at victory through certification by the appeals court after an adverse district court ruling." *All. for Prop. Rights & Fiscal Resp. v. City of Idaho Falls*, 742 F.3d 1100, 1108 (9th Cir.

2013); *Thompson v. Paul*, 547 F.3d 1055, 1065 (9th Cir. 2008). Overcoming that presumption requires Appellants to "demonstrate particularly compelling reasons" for certification, *City of Idaho Falls*, 742 F.3d at 1108 (citation omitted), which do not exist here.

Rather, as in *City of Idaho Falls*, this appeal involves routine "statutory construction," not interpretation of a state Constitution, and "does not implicate [Washington] state sovereignty." *Id.* at 1109. Even in the absence of the presumption that applies in this case, "[c]ertification is not appropriate where the state court is in no better position than the federal court to interpret the state statute." *Micomonaco v. State of Wash.*, 45 F.3d 316, 322 (9th Cir. 1995).

This is true here. As evident from the parties' briefing, both this Court and the Washington Supreme Court have "repeatedly applied" the relevant CPA standards. *See id.*; *see also Syngenta Seeds, Inc. v. County of Kauai*, 842 F.3d 669, 671 (9th Cir. 2016) ("certification is unnecessary" when the applicable state-law standard is "well-defined"). As a result, "the Supreme Court of Washington is in no better position than is this court to decide the question[s] posed by this case." *Micomonaco*, 45 F.3d at 322; *see also James v. Safeguard Props. LLC*, 821 F. App'x 683, 686 (9th Cir. 2020) (citation omitted) (certification inappropriate where "[m]ultiple Washington cases discuss the good faith defense in the context of CPA claims . . .

so this is not a case where 'a question of law has not been clearly determined by the Washington courts'"). Appellants' request for certification should be denied.

## **<u>CONCLUSION</u>**

This Court should affirm the District Court's judgment of dismissal.

Dated: April 26, 2024                    Respectfully submitted,

                                                      /s/ Brent Caslin
                                                      Brent Caslin
                                                      Kelly M. Morrison
                                                      JENNER & BLOCK LLP
                                                      515 S. Flower St., Ste. 3300
                                                      Los Angeles, CA 90071
                                                      Tel: 213-239-5100
                                                      bcaslin@jenner.com
                                                      kmorrison@jenner.com

                                                      Jeremy M. Creelan
                                                      Joseph L. Noga
                                                      JENNER & BLOCK LLP
                                                      1155 Avenue of the Americas
                                                      New York, NY 10036
                                                      Tel: 212-891-1600
                                                      jcreelan@jenner.com
                                                      jnoga@jenner.com

                                                      *Counsel for Defendant-Appellee*
                                                      *Unison Agreement Corporation*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Unison Agreement Corporation states that it is not aware of any related cases pending in this Court.

Dated: April 26, 2024                    Respectfully Submitted,

/s/ Brent Caslin
Brent Caslin
Kelly M. Morrison
JENNER & BLOCK LLP
515 S. Flower St., Ste. 3300
Los Angeles, CA 90071
Tel: 213-239-5100
bcaslin@jenner.com
kmorrison@jenner.com

Jeremy M. Creelan
Joseph L. Noga
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel: 212-891-1600
jcreelan@jenner.com
jnoga@jenner.com

*Counsel for Defendant-Appellee*
*Unison Agreement Corporation*

## **CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Circuit Rule 32-1(a) because, excluding the portions of the brief required by Federal Rule of Appellate Procedure 32(f), there are 13,679 words in the brief according to the word count function of Microsoft Word for Microsoft 365, the word processing program used to prepare the brief.

2.      This brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it is written in 14-point Times New Roman font.

Dated: April 26, 2024                          Respectfully Submitted,

/s/ Brent Caslin
Brent Caslin
Kelly M. Morrison
JENNER & BLOCK LLP
515 S. Flower St., Ste. 3300
Los Angeles, CA 90071
Tel: 213-239-5100
bcaslin@jenner.com
kmorrison@jenner.com

Jeremy M. Creelan
Joseph L. Noga
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel: 212-891-1600
jcreelan@jenner.com
jnoga@jenner.com

*Counsel for Defendant-Appellee Unison Agreement Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 26, 2024. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 26, 2024                    Respectfully Submitted,

                                         /s/ Brent Caslin
                                         Brent Caslin
                                         Kelly M. Morrison
                                         JENNER & BLOCK LLP
                                         515 S. Flower St., Ste. 3300
                                         Los Angeles, CA 90071
                                         Tel: 213-239-5100
                                         bcaslin@jenner.com
                                         kmorrison@jenner.com

                                         Jeremy M. Creelan
                                         Joseph L. Noga
                                         JENNER & BLOCK LLP
                                         1155 Avenue of the Americas
                                         New York, NY 10036
                                         Tel: 212-891-1600
                                         jcreelan@jenner.com
                                         jnoga@jenner.com

                                         *Counsel for Defendant-Appellee Unison Agreement Corporation*