No. 23-2835

# In the United States Court of Appeals for the Ninth Circuit

CHARLES BOYD OLSON and JANINE OLSON,
*Plaintiffs-Appellants,*

v.

UNISON AGREEMENT CORPORATION,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Washington (Seattle)
Case No. 2:22-cv-01859-RAJ (Hon. Richard A. Jones)

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

BETH E. TERRELL
BLYTHE H. CHANDLER
ELIZABETH A. ADAMS
TERRELL MARSHALL
LAW GROUP PLLC
936 N 34th Street
Suite 300
Seattle, WA 98103
(206) 319-5450
bterrell@terrellmarshall.com

MATTHEW W.H. WESSLER
THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

JOSEPH W. MOORE
UMAR I. GEBRIL
CASCADE LAW PLLC
2707 Colby Avenue
Suite 1420
Everett, WA 98201
(425) 998-8999
joseph@cascade.law

July 1, 2024                 *Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Table of authorities ................................................................................................iii

Introduction ................................................................................................1

Argument ................................................................................................3

I. Unison's unlicensed mortgage on the Olsons' home
violates the Consumer Loan Act ................................................3

    A. Unison's product is a reverse mortgage loan ..............................3

    B. There's no reason to depart from the statute's text
and context ................................................................8

    C. Unison's product is also a residential mortgage loan .................12

II. The CPA prohibits Unison's attempt to creatively evade
the law ................................................................14

    A. Unison misstates the standard for an unfair practices
claim ................................................................15

    B. Unison's product is an unfair practice trying to
inventively avoid regulation. ................................................16

    C. The Washington legislature tasked courts with
protecting against attempts to dodge regulation ........................19

    D. Unison's contract is unconscionable ................................21

III. Unison's marketing is deceptive and misleading ...................22

    A. Unison's statements have been consistently
identified as misleading and deceptive ................................23

    B. The Olsons sufficiently alleged that Unison's
marketing statements caused harm ................................25

    C. Unison's deceptive marketing can't be rescued by a
boilerplate disclaimer ................................................26

i

IV.  This appeal involves important and novel questions of
     state law.................................................................................27

Conclusion   ...........................................................................29

## TABLE OF AUTHORITIES

### Cases

*Alliance for Property Rights and Fiscal Responsibility v. City of Idaho Falls,*
742 F.3d 1100 (9th Cir. 2013) ................................................................. 29

*American Continental Insurance Company v. Steen,*
91 P.3d 864 (Wash. 2004) ........................................................... 3, 4, 13

*Aviation West Corporation v. Washington State Department of Labor and Industries,*
980 P.2d 701 (Wash. 1999) ........................................................... 9, 10

*Boquist v. Courtney,*
32 F.4th 764, 773 (9th Cir. 2022) ........................................................ 8, 26

*Cassirer v. Thyssen-Bornemisza Collection Foundation,*
69 F.4th 554 (9th Cir. 2023) ................................................................. 27

*Davis v. HSBC Bank of Nevada, N.A.,*
691 F.3d 1152 (9th Cir. 2012) ............................................................... 27

*Deegan v. Windermere Real Estate/Center-Isle,*
391 P.3d 582 (Wash. App. 2017) ........................................................... 16

*Hoover v. Bouffleur,*
133 P. 602 (Wash. 1913) ....................................................................... 10

*Hopkins v. Barlin,*
196 P.2d 347 (Wash. 1948) .................................................................... 11

*Klem v. Washington Mutual Bank,*
295 P.3d 1179 (Wash. 2013) ........................................................... *passim*

*Lavis v. Reverse Mortgage Solutions,*
2018 WL 2171444 (S.D.W. Va. 2018) ..................................................... 27

*Lisson v. Wells Fargo Bank, N.A.,*
2019 WL 3577859 (Wash. App. 2019) .................................................... 16

*Magney v. Lincoln Mutual Savings Bank,*
659 P.2d 537 (1983) ............................................................................. 16

*Mellon v. Regional Trustee Services Corporation*,
  334 P.3d 1120 (Wash. App. 2014) ................................................15, 16, 17

*Northwestern Band of the Shoshone Nation v. Wooten*,
  83 F.4th 1205 (9th Cir. 2023) .................................................. 25

*Orkin v. Taylor*,
  487 F.3d 734 (9th Cir. 2007)........................................................16

*Panag v. Farmers Insurance Company of Washington*,
  204 P.3d 885 (Wash. 2009) ............................................... *passim*

*Parents Involved in Community Schools v. Seattle School District No. 1*,
  294 F.3d 1085 (9th Cir. 2002) .................................................. 29

*Phillips v. Blaser*,
  125 P.2d 291 (Wash. 1942) .........................................................14

*Potter v. City of Lacey*,
  46 F.4th 787 (9th Cir. 2022) .............................................28, 29

*Ruelas v. County of Alameda*,
  51 F.4th 1187 (9th Cir. 2022) .................................................. 28

*Ruiz Torres v. Mercer Canyons*,
  835 F.3d 1125 (9th Cir. 2016) .................................................. 25

*Rush v. Blackburn*,
  361 P.3d 217 (Wash. App. 2015) ................................................16

*Singhal v. Unison Agreement Corporation*,
  2023 WL 2734230 (S.D. Fla. 2023) ..............................................8

*Snohomish County. v. Pollution Control Hearings Board*,
  386 P.3d 1064 (Wash. 2016).......................................................14

*State of Washington v. Cronin*,
  923 P.2d 694 (Wash. 1996)...................................................... 20

*State of Washington v. Delgado*,
  63 P.3d 792 (Wash. 2003) ............................................................9

*State of Washington v. Kaiser,*
    254 P.3d 850 (Wash. App. 2011) ........................................................................21, 26

*State of Washington v. Schwab,*
    693 P.2d 108 (Wash. 1985) ........................................................................ 20

*State of Washington v. Wolvelaere,*
    461 P.3d 1173 (Wash. 2020) ........................................................................4, 9, 10

*Ten Bridges v. Guandai,*
    474 P.3d 1060, 1063 (Wash. App. 2020) ................................................................10

*T-Mobile USA v. Selective Insurance Corporation of America,*
    908 F.3d 581 (9th Cir. 2018) ........................................................................ 29

*United States v. Williams,*
    846 F.3d 303 (9th Cir. 2016)........................................................................12, 25

*Weingot v. Unison Agreement Corporation,*
    2024 WL 1191106 (E.D.N.Y. 2024) ........................................................................ 25

*Yamashita v. LG Chemicals Limited,*
    48 F.4th 993 (9th Cir. 2022)........................................................................28, 29

*Yee v. City of Escondido,*
    503 U.S. 519 (1992)........................................................................12

*Young v. Toyota Motor Sales, U.S.A.,*
    472 P.3d 990 (2020)........................................................................22, 24, 25

**Statutes**

15 U.S.C. § 1602(f) ........................................................................9

RCW § 19.144.010(8) ........................................................................13

RCW § 19.52.020(1) ........................................................................22

RCW § 2.60.020........................................................................27

RCW § 31.04.015(14)........................................................................12

RCW § 31.04.015(24) .................................................................... 9, 13

RCW § 31.04.025(g) ........................................................................ 9

RCW § 31.04.102(3) ........................................................................ 9

RCW § 31.04.105(1) .......................................................................22

RCW § 31.04.505(5) ....................................................... 3, 9, 10, 27

RCW § 31.04.505(5)(a) ................................................................... 4

RCW § 31.04.505(5)(b) ................................................................... 4

RCW § 31.04.515(10) ..................................................................18, 27

RCW § 31.04.515(9) ......................................................................18

RCW § 31.04.520 ........................................................................... 9

RCW § 31.04.525 ..........................................................................18

RCW § 61.24.020 ..........................................................................14

## Other Authorities

*Aegean Financial,*
   No. 2016-CFPB-0025 (Dec. 7, 2016) ........................................ 23

*All-Transactions House Price Index for Washington,*
   Federal Reserve Bank of St. Louis .............................................6

*American Advisors Group,*
   2016 WL 8539273 (Dec. 7, 2016) ............................................. 23

*California Dream for All: A Proposed Shared Appreciation*
*Loan Investment Fund for the State of California,*
   California State Treasurer's Office (June 6, 2022) ................19

*Credit,*
   Merriam-Webster Dictionary .......................................... 4, 5, 7

*Debt*,
   Merriam-Webster ........................................................................... 10, 24

Black's Law Dictionary (11th ed. 2019) ......................................... 5

*Podcast Transcription Session No. 103—Thomas Sponholtz & Jim Riccitelli*,
   Lend Academy (2017) ................................................................. 8, 28

Sam Brittingham,
   *Aging Out of Place: The Toll of Reverse Mortgages and How to Fix the Program*,
   29 Elder L.J. 149 (2021) ............................................................. 19

Sarah B. Mancini & Odette Williamson,
   *Reversing Course: Stemming the Tide of Reverse Mortgage Foreclosures*
   *Through Effective Servicing and Loss Mitigation*, 26 Elder L.J. 85 (2018) .................. 18, 24

*The Smart Way To Access Home Equity*,
   Unlock ....................................................................................... 28

*Unison Announces Securitization of $165 Million Unison Home Equity Agreements*,
   Newswire ..................................................................................... 8

*Unison Eyes up to Three Home Equity RMBS in 2022*,
   International Financing Review ..................................................... 28

## INTRODUCTION

The Olsons are Washington homeowners who spent over three decades diligently paying off their mortgage. Then, in the space of just a few years, they lost much of the value in their home to Unison, a billion-dollar financial technology company based in San Francisco. Taking advantage of a moment of financial distress, Unison gave the Olsons a lump sum advance and locked them into a contract that allows Unison to receive several multiples of that amount in equity in the Olsons' home—returns far exceeding what Unison could get under any regular mortgage and what consumer protection laws ordinarily allow. And until that payout, the Olsons are responsible for all the taxes, insurance, and maintenance costs of the property, on pain of foreclosure by Unison.

In their opening brief, the Olsons explained how Unison's product operates as a reverse mortgage—a financial instrument singled out by legislators, regulators, and commentators as especially dangerous for seniors in financial distress. These complex instruments are marketed directly to elderly homeowners using misleading assurances, and nearly twenty percent of reverse mortgages are at risk of default. The Olsons also demonstrated how Unison's product flouts the protections the Washington legislature has established for reverse mortgages. For example, Unison doesn't even take simple steps like ensuring that homeowners receive independent counseling before putting their homes in jeopardy.

Unison offers an increasingly convoluted response. Unison now admits that it has a mortgage on the Olsons' home. But Unison nonetheless claims that it's exempt from all rules for mortgage lenders because when payment comes due, Unison doesn't receive a large percentage of the value of the home—it receives an "option" to purchase a large percentage of the value of the home. This accounting trick is not enough. Unison's product meets the statutory definition of a reverse mortgage (or just a mortgage) loan under the Washington Consumer Loan Act. And even if Unison managed to slip through the letter of the law, that would violate the Washington Consumer Protection Act's prohibition on conduct that "inventively evades regulation." *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 895 (Wash. 2009).

In an effort to dodge Washington's protections for homeowners, Unison—like the district court below—relies primarily on federal law. But Washington courts have made clear that the state's CPA is distinct from federal law and prohibits such attempts to circumvent the letter of the law. That is especially true in the fast-moving financial technology space. In yet another parallel with reverse mortgages, Unison is bundling and securitizing its products in offerings of up to $443 million. Unison boasts that around $20 trillion in home equity is untapped in the country—i.e., in the hands of homeowners who paid for it—and the goal is to acquire, bundle, and securitize as much of it as possible. This is precisely the sort of situation where the CPA requires courts to fill in the gaps and protect Washington residents.

**ARGUMENT**

## I. Unison's unlicensed mortgage on the Olsons' home violates the Consumer Loan Act.

Unison gave the Olsons a lump sum advance for a deed of trust on their home, and upon three triggering conditions, Unison has a right to payment from the value of the Olsons' home. That's a reverse mortgage—or at the very least a mortgage. Either way, it's a per se violation of the CPA, because Unison pushes these complex financial products on homeowners in financial distress without complying with key Consumer Loan Act protections. Unison now appears to concede (at 29) that it has a mortgage on the Olsons' home. But Unison claims that while it may have mortgage, it's still not a reverse mortgage or mortgage *loan* because it is styled as an option. That's incorrect as a matter of plain meaning, statutory context, and common sense.

### A. Unison's product is a reverse mortgage loan.

As Unison concedes, "[l]egislative definitions included in the statute are controlling." *Am. Cont'l Ins. Co. v. Steen*, 91 P.3d 864, 867 (Wash. 2004).[1] Here, the Consumer Loan Act provides specific criteria that define a "[r]everse mortgage loan." RCW § 31.04.505(5). As the Olsons set out in their opening brief, Unison's product meets these criteria. Op. Br. 17-19, 30-32. The product is a "nonrecourse

---

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

consumer credit obligation" where: (1) a homeowner is given "one or more advances"; (2) Unison receives security through "[a] mortgage [or] deed of trust"; and (3) any "shared appreciation or equity is due and payable, other than in the case of default, only after: (i) The consumer dies; (ii) The dwelling is transferred; or (iii) The consumer ceases to occupy the dwelling as a dwelling." RCW § 31.04.505(5)(a), (b).

**1.** In response, Unison hangs its entire argument on the idea that its product doesn't qualify as "credit" in the threshold clause of the definition. Basic principles of Washington statutory interpretation say otherwise.

The Consumer Loan Act doesn't define "credit," so Washington courts "give the term its plain and ordinary meaning ascertained from a standard dictionary." *Am. Cont'l*, 91 P.3d at 867. In common usage, "credit" includes "the provision of money, goods, or services with the expectation of future payment." *Credit*, Merriam-Webster Dictionary, https://perma.cc/5AJB-EWPN. And a "future payment" could certainly include money or equity from the sale of a home. *Id.*

"[T]he context of the statute" points in the same direction. *State v. Wolvelaere*, 461 P.3d 1173, 1174 (Wash. 2020). It provides criteria for what qualifies as a "credit obligation" in this particular context. Specifically, the amount that becomes "due and payable"— the expected future payment—can be "principal, interest, *or* shared appreciation or equity." RCW § 31.04.505(5)(b) (emphasis added). The disjunctive

4

"or" makes clear that payment need not take the form of "principal" or "interest." *Id.* And a future payment of "equity" or "shared appreciation" (if any) will necessarily vary with the housing market. That uncertainty is built into the definition of a reverse mortgage.[2] The fact that a lender could receive no repayment—such as if a foreclosed home lacks sufficient value to pay lower-priority creditors—is just part of the nature of a "nonrecourse" obligation. *Nonrecourse*, Black's Law Dictionary (11th ed. 2019).

**2.** On this ordinary meaning of "credit," there can be little question that Unison's product involves "the provision of money … with the expectation of future payment." *Credit*, Merriam-Webster.

Unison's product is structured to ensure exactly that. If the homeowner sells within three years, Unison is guaranteed its advance payment back (plus its initial fees, ensuring a profit) and potentially more if the house rose in value. 1-ER-121 § 10.4(b). The same is true if, after the three-year period, the homeowner wants to buy out of the contract without losing their home. 1-ER-97 § 6.2. That's an obvious loan, where the homeowner must pay back the principal plus what is effectively interest tied to the appreciation of the home.

---

[2] Unison notes (at 31 n.17) that reverse mortgages with certain safeguards for homeowners can receive federal insurance against losses, but no part of the Washington definition of reverse mortgage turns on this.

If the house is sold at any point after three years and its value has increased or held steady, the homeowner still never gets any "second payment" for Unison's "option." Unison Br. 7. No money leaves Unison's account. Instead, the homeowner is just required to repay Unison's advance plus effective interest tied to any shared appreciation. *See* 1-ER-92 § 3.3(a), (b). And if the 30-year term expires and the house has increased in value or held steady, the homeowner either repays Unison plus effective interest or Unison forces the sale of the home with the same result. 1-ER-94-95.

Thus, as the Washington Department of Financial Institutions explains, "Unison makes the investor payment to a homeowner, and secures the Agreement with a deed of trust, with the expectation that property values will increase, as they typically do over time." DFI Br. 4. The data bear that out; Unison's decades-long timeline helps ensure that the value of the house will rise considerably; a home sold at the lowest point of the Great Recession would still have risen considerably in value from ten years earlier, and far more from twenty and thirty years earlier.[3]

The initial three-year period further protects Unison against medium-term drops, during which time Unison doesn't share in the homeowner's losses at all. Homeowners also have the least incentive to sell during a slump in home prices.

---

[3] *All-Transactions House Price Index for Washington*, Federal Reserve Bank of St. Louis, https://perma.cc/74U2-7ZT5.

Unison further gives itself significant power over sales; if Unison doesn't like the price, it can take steps that will delay the sale, and will be held "harmless" for "any and all liability or loss" caused to the Olsons by the "delay or postponement." 1-ER-93-94 §§ 3.2, 3.4, 3.5, 3.6.

Nor does the possibility that Unison might lose money make the contract "markedly different from a reverse mortgage loan." Unison Br. 30. Even if the house loses value, Unison admits (at 6) that it will still exercise its "option" in many cases—meaning it still gets a "future payment," *Credit*, Merriam-Webster. It's only if the Olsons' home drops 25% or more that Unison won't seek repayment.[4] To illustrate how unlikely this is, if Unison entered a contract at the peak before the 2008 crash and the house was sold at the end of the three-year period where Unison is guaranteed repayment, Unison would *still* have exercised its "option."[5] And even the edge cases still don't "fundamentally" distinguish Unison's product from other nonrecourse credit obligations, Unison Br. 30, since these can also suffer total losses, as explained above. *See supra* 5. At most, any differences would be in degree, not in kind.

---

[4] Only when 70% of the equity is less than Unison's "second payment" of $194,250 will Unison not invoke its "option." That would require a drop of 25%, from $370,000 to $277,500. Unison Br. 6-7.

[5] Between Q4 2007 and Q4 2010, Washington home prices dropped less than 19%. *House Price Index for Washington*, Federal Reserve, https://perma.cc/74U2-7ZT5.

This Court need not take the Olsons' (or the state regulatory agency's) word for it—this is also what Unison tells investors, emphasizing the "low volatility" of its "reliable, gainful asset[s]." *Unison Announces Securitization of $165 Million Unison Home Equity Agreements*, Newswire, https://perma.cc/A9EP-A236. While Unison points this Court to a recent blip in house prices, its message to everyone else is that "[a]fter a previous short-term decline, home prices have leveled off and sprung to life" with "historical" rates of growth. *Id.* Unison also boasts about how it picks homes to guarantee repayment: "We have a 10-year forecast on every house in America so we have a very sophisticated data infrastructure and pricing structure" for "what we call turning a house into a security." *Podcast Transcription Session No. 103—Thomas Sponholtz & Jim Riccitelli*, Lend Academy (2017), https://perma.cc/5RZ4-TP2K.

Drawing "all reasonable inferences in [the Olsons'] favor," it is—at the very least—"plausible" that Unison has an expectation of future payment. *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022). And, as another court held in a lawsuit against Unison, any "question of fact" as to whether "the substance of the transaction rather than the form" makes the product a loan should proceed to discovery. *Singhal v. Unison Agreement Corp.*, 2023 WL 2734230, at *5 (S.D. Fla. 2023).

## B. There's no reason to depart from the statute's text and context.

**1.** Unison doesn't engage with the plain meaning or statutory context of the Consumer Loan Act. Instead, Unison claims (at 22-23) that the term "credit" in the

incorporates a general definition from the federal Truth in Lending Act. That's backwards; "[i]f the text and context is clear," a court must "stop." *Wolvelaere*, 461 P.3d at 1174. Only if "the text and context is unclear" may a court "go further." *Id.*

What's more, when the Washington legislature wanted to import TILA definitions into the Consumer Loan Act, it did so expressly. *See* RCW § 31.04.015(24) ("dwelling, as defined in the truth in lending act"); *see also* § 31.04.025(g); § 31.04.102(3); § 31.04.520. This shows that "the legislature knew how to include" federal definitions "in the definition of" state law terms and decided when (and when not) to do so. *State v. Delgado*, 63 P.3d 792, 795 (Wash. 2003). It didn't do so for "credit."

But even if the Court looked to TILA's general definition, it would be satisfied. When "one statutory provision … deals with a subject in a general way and another … deals with the same subject in a specific manner, the latter will prevail." *Aviation W. Corp. v. Washington State Dep't of Lab. & Indus.*, 980 P.2d 701, 711 (Wash. 1999). That's especially true given RCW § 31.04.505(5)'s structure; "credit obligation" is in a threshold clause that precedes specific criteria defining a reverse mortgage. It would be "an odd canon of construction that would insert in a vague and general definitional clause a threshold requirement that overcomes the specific language" of a more precise definition. *Aviation*, 980 P.2d at 711.

Thus, TILA's definition of "credit" as "the right granted by a creditor to a debtor to defer payment of debt," 15 U.S.C. § 1602(f), must be read in light of RCW

§ 31.04.505(5)'s specific articulation of what qualifies as deferring payment of a debt in this context: receiving an advance and then later paying out of the home's value. That's also consistent with the plain meaning of "debt": "being under obligation to pay or repay someone or something in return for something received." *Debt*, Merriam-Webster, https://perma.cc/WK7A-LWN2.

The same goes for the similarity between the definition of a reverse mortgage in the Consumer Loan Act and a federal regulation. This again underscores that the Washington legislature was aware of federal regulations but chose to expressly incorporate them only in a few specific places. *See Wolvelaere*, 461 P.3d at 1174. And when Washington borrows language from federal law, Washington courts aren't required to interpret state law in lockstep with corresponding federal law. *See, e.g.*, *Aviation*, 980 P.2d at 711.

**2.** Unison fares little better with its insistence that options can't be mortgage loans. Any general distinction between these two cannot override the statute's specific "text and context." *Wolvelaere*, 461 P.3d at 1174. What's more, Washington courts have repeatedly rejected a bright-line distinction between options and mortgages. Options are in fact a common way to hide loans, including mortgage loans—as Washington caselaw has recognized for a century. *See, e.g.*, *Hoover v. Bouffleur*, 133 P. 602, 603 (Wash. 1913). What matters is the substance, not form. *See, e.g.*, *Ten Bridges v. Guandai*, 474 P.3d 1060, 1063, 1068-69 (Wash. App. 2020).

A simple example illustrates why. Imagine Unison's contract gave an advance of $25,000. Then upon sale of the home, Unison has the "option" to give the Olsons $25,000 for the sum of $300,000 in sale proceeds. That's just a loan with a usurious interest rate. So even if some extraneous provisions of Washington law or federal regulations generally distinguish between the two kinds of instruments, Unison Br. 22-24, a purported option doesn't categorically prevent something from being a loan. Otherwise, any payday lender could give someone a small advance for an "option" to later "buy" most of her paycheck. Unison has done everything it can to ensure this is how its product will function. And contrary to Unison's argument (at 30-31), the fact that an expected future payment might not ultimately materialize doesn't prevent something from being a nonrecourse credit obligation. *See supra* 5.

Further, as the Department points out, Unison doesn't identify any option in the history of Washington State that looks anything like its product. DFI Br. 16-17. For instance, "the Agreement creates a lien that encumbers the entire property, which is completely unlike an option contract to purchase real estate that does not create any right to the subject property at all." *Id.* at 17; *see also Hopkins v. Barlin*, 196 P.2d 347, 350 (Wash. 1948). That's not to mention the product's 30-year term, Unison's power of nonjudicial foreclosure, and the three triggering conditions. Unison (at 20) doesn't identify any similar option, despite canvassing a century of

caselaw. All of those characteristics are, however, prototypical features of reverse mortgages.

**3.** Sensing weakness on the merits, Unison claims that the Olsons have forfeited the argument that the product is a reverse mortgage. But it is "claims that are deemed waived or forfeited, not arguments." *United States v. Williams*, 846 F.3d 303, 311 (9th Cir. 2016). The Olsons' per se claim was "properly presented," so they "can make any argument in support of that claim" and "are not limited to the precise arguments they made below." *Id.* (quoting *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992)). From the beginning, the Olsons have argued that Unison's product is an unlicensed mortgage under the Consumer Loan Act, a per se violation of the CPA. Whether that's because the product fits the statutory definition of a reverse mortgage, Washington caselaw requires the product to be treated as an equitable mortgage, or the Deed of Trust Act makes clear that the product is a mortgage—these are all just different "argument[s] in support of that claim." *Id.*

**C.    Unison's product is also a residential mortgage loan.**

Even if Unison's product were not a reverse mortgage specifically, it's still an illegal residential mortgage loan. The district court incorrectly held otherwise without any analysis of the Washington statute's text or context.

The Consumer Loan Act defines "loan" as "a sum of money lent at interest *or* for a fee or other charge." RCW § 31.04.015(14) (emphasis added). As the Department

explains, "Unison advances money to the homeowner for a fee or other charge, meeting the definition of a loan under the Consumer Loan Act." DFI Br. 7. In exchange for the advance payment, the Olsons gave Unison a deed of trust in their home, paid significant fees, and gave Unison the ability to obtain much of their home equity. Yet while a "[l]egislative definition[] included in the statute [is] controlling," Unison never mentions it. *Am. Cont'l*, 91 P.3d at 867.

Unison's product also meets the definition of a "residential mortgage loan," which is "any loan primarily for personal, family, or household use that is secured by a mortgage, deed of trust, or other consensual security interest on a dwelling, as defined in the truth in lending act, or residential real estate upon which is constructed or intended to be constructed a dwelling." RCW § 31.04.015(24). Unison misleadingly asserts (at 23) that this provision "expressly incorporated the TILA definition of 'residential mortgage loan.'" But it is only "dwelling, as defined in the truth in lending act" that is being incorporated. RCW § 31.04.015(24).

Statutory context points in the same direction. As the Department explains, "[e]ven the application process Unison employs invokes the process used to apply for a mortgage" and is "virtually identical" to the process set out "[u]nder the Mortgage Lending and Homeownership Act." DFI Br. 9-10 (citing RCW § 19.144.010(8)). That includes "an appraisal and complet[ing] a loan closing with a title company, just as a lender would when issuing a mortgage loan." *Id.*

If any ambiguity remained, Washington courts "accord an agency's interpretation of the law great weight where the statute is ambiguous and is within the agency's special expertise." *Snohomish Cnty. v. Pollution Control Hearings Bd.*, 386 P.3d 1064, 1075 (Wash. 2016). The Department enforces the Consumer Loan Act and it has "clarified by rule that it regulates the type of home equity sharing agreement at issue here." DFI Br. 8. The Department has also made clear that "shared appreciation mortgage[s]" of this kind are "loan products" that "are generally a silent second mortgage in exchange for a share of the home's future appreciation or value." *Id.*

Finally, as above, Washington caselaw puts substance over form. Unison now appears to concede (at 29) that it has a mortgage on the Olsons' home. *See* RCW § 61.24.020 ("[A] deed of trust is subject to all laws relating to mortgages on real property."). Unison has also structured its product to function like a mortgage loan. So even when dressed up as an option, it should be treated as an "equitable mortgage." *Phillips v. Blaser*, 125 P.2d 291, 293-94 (Wash. 1942); *see also* DFI Br. 11-15.

## II.  The CPA prohibits Unison's attempt to creatively evade the law.

Even if Unison managed to design a product that functions like a reverse mortgage, poses the risks of a reverse mortgage, lacks safeguards necessary for reverse mortgages, yet avoids the reverse mortgage statute, that's just what the CPA is designed to capture: "unfair … conduct that inventively evades regulation." *Panag*, 204 P.3d at 895. And for all of Unison's emphasis on its "option," Unison doesn't

explain how this mechanism reduces the serious risks the Washington legislature targeted. Instead, Unison conflates the standard with a narrower federal standard. Then it claims (at 50) that it would be "unfair to Unison"—a billion-dollar company—to protect the Olsons from a sophisticated product crafted with surgical precision to evade the letter of the law. But protecting Washington residents against such practices is exactly the role that the Washington legislature assigned to courts.

### A. Unison misstates the standard for an unfair practices claim.

The CPA "protect[s] the public from inventive attempts to engage in unfair and deceptive business practices." *Panag*, 204 P.3d at 898. That includes practices that "offend[] public policy as established by statutes or the common law, or [are] unethical, oppressive, or unscrupulous, among other things." *Mellon v. Reg'l Tr. Servs. Corp.*, 334 P.3d 1120, 1126-27 (Wash. App. 2014).

Unison, however, claims there's only one test: "An 'unfair' practice is one that 'causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits.'" Unison Br. 37-38 (quoting *Klem v. Wash. Mut. Bank*, 295 P.3d 1179, 1187 (Wash. 2013)). But the sentence Unison quotes is describing "[c]urrent federal law," which immediately follows the statement that "[a]lthough we have been guided by federal interpretations, Washington has developed its own jurisprudence regarding application of Washington's CPA." *Klem*, 295 P.3d at 1187. *Klem* also quoted earlier

Washington cases holding that "an act is unfair under the CPA if it … is unethical, oppressive, or unscrupulous, among other things." *Id.* at 1186 (quoting *Magney v. Lincoln Mut. Sav. Bank*, 659 P.2d 537, 545 (1983))." And while *Panag* held that deceptive practices claims need not meet the "not reasonably avoidable" standard, it never held that all unfair practices claims must do so. 204 P.3d at 896.

Thus, Washington appellate courts have continued to explain post-*Klem* that there are multiple ways to show that a practice is unfair. *See Mellon*, 334 P.3d at 1126-27; *Rush v. Blackburn*, 361 P.3d 217, 224-25 (Wash. App. 2015); *Lisson v. Wells Fargo Bank, N.A.*, 2019 WL 3577859, at *7 (Wash. App. 2019). And courts have rejected attempts to use Unison's language from *Klem* to limit the scope of unfair practices, calling it "dicta." *Deegan v. Windermere Real Est./Ctr.-Isle*, 391 P.3d 582, 589 n. 47 (Wash. App. 2017).

### B. Unison's product is an unfair practice trying to inventively avoid regulation.

Unison's reliance on the wrong standard is a problem, because Unison just points to federal courts applying that standard. Unison Br. 44-45. But "[t]he task of a federal court in a diversity action is to approximate state law as closely as possible." *Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007).

**1.** Applying the proper standard, the Olsons' opening brief explained in detail (at 41-46) how Unison's product is a paradigmatic example of "unfair … conduct that

inventively evades regulation," *Panag*, 204 P.3d at 895, and "offends public policy as established by statutes or the common law," *Mellon*, 334 P.3d at 1126-27.

*First*, a violation of the reverse mortgage statute is a "per se violation of the CPA," which "reflect[s] the public policy significance of this industry" and indicates that such mortgage products "affect[] the public interest." *Panag*, 204 P.3d at 897.

*Second*, reverse mortgage companies "are subject to strict regulation to ensure they deal fairly and honestly" with homeowners, and "[t]he strong public policy underlying state and federal law regulating" reverse mortgage practices "also applies where [these practices] do not fall within the laws' prohibitions." *Id.*

*Third*, existing statutes are "important" because they offer guidance as to the kinds of practices that violate public policy. *Id*. Unison's practices—failing to pre-clear its product, failing to ensure homeowners receive independent counseling, requiring insurance, placing no limits on usurious returns—are exactly the kinds of practices that the legislature deemed to violate public policy. And Unison doesn't explain how its "option" mechanism negates the dangers the legislature targeted, such as homeowners in financial distress being locked into complex agreements that put their homes and equity at risk without any independent counseling.

*Finally*, any doubt is resolved by "the statutory mandate to liberally construe the CPA in order to protect the public from inventive attempts to engage in unfair and deceptive business practices." *Id.* at 898.

Unison never addresses any of this. Instead, it just claims (at 48) that "*Panag* did not address whether or when non-deceptive practices that do not violate a statute might be 'unfair' under the CPA." But *Panag* repeatedly emphasizes that the CPA "provide[s] sufficient flexibility to reach unfair *or* deceptive conduct that inventively evades regulation." *Id.* at 895, 898 (emphasis added). Thus, "[a]ny doubt should have been put to rest in *Panag*, where we discussed both per se and unregulated unfair or deceptive acts." *Klem*, 295 P.3d at 1187. And *Panag* is the Washington Supreme Court's most detailed guidance for determining when a practice "inventively evades regulation." 204 P.3d at 895.

**2.** Unison dismisses extensive commentary from courts, regulators, and scholars about the risks of reverse mortgages as "anecdotes" and "tales." Unison Br. 4 n.3. But these sources rely on hard data, including that nearly twenty percent of reverse mortgages are at risk of default. *See, e.g.*, Sarah B. Mancini & Odette Williamson, *Reversing Course: Stemming the Tide of Reverse Mortgage Foreclosures Through Effective Servicing and Loss Mitigation*, 26 Elder L.J. 85, 87 (2018). Unison's product shares the tax, insurance, and maintenance requirements that trigger many defaults. *Id.* Fortunately, the worst hasn't happened to the Olsons yet. But the Washington legislature determined, as a matter of public policy, that ex ante protections are necessary *before* homeowners in financial distress are locked into such complex and risky products. RCW §§ 31.04.515(9), (10); 31.04.525.

Unison also boasts that the "benefits" of its "option product" have been recognized by governments and scholars. Unison Br. 46-47. Tellingly, all Unison's quotes are about the potential benefits of *reverse mortgages* (when properly regulated) or loans. Unison Br. 46 n.22, 47 n.23; *see, e.g.*, Sam Brittingham, *Aging Out of Place: The Toll of Reverse Mortgages and How to Fix the Program*, 29 Elder L.J. 149, 158 (2021) ("The reverse mortgage is an interesting and useful wealth management tool. Still, it does not come without its dangers."). Unison cites no source praising its risky and predatory product—much less approving of selling it without the kinds of safeguards the Washington legislature deemed necessary. The only source discussing Unison actually unfavorably cites the "large[] share" of home equity that Unison takes to guarantee "the returns demanded by private investors." *California Dream for All: A Proposed Shared Appreciation Loan Investment Fund for the State of California*, California State Treasurer's Office (June 6, 2022), at 37, https://perma.cc/WJ2J-YM3Q. And in any event, this Court need not hold that such products can never be sold, just that they are unfair practices when sold *without* such safeguards.

### C. The Washington legislature tasked courts with protecting against attempts to dodge regulation.

Unison's fallback is to attack the very idea that courts can police unfair conduct not regulated by statute. According to Unison (at 50), this is "unfair to the Legislature" and "raise[s] due process and separation-of-powers concerns." The Washington Supreme Court disagrees.

In fact, it was "the legislature [that] intended to provide sufficient flexibility to reach unfair or deceptive conduct that inventively evades regulation." *Panag*, 204 P.3d at 895. It was the legislature that recognized that "[g]iven that there is no limit to human inventiveness," "courts, as well as legislatures, must be able to determine whether an act or practice is unfair or deceptive to fulfill the protective purposes of the CPA." *Klem*, 295 P.3d at 1187. And it was the legislature that, in choosing to "not define unfair" in the statute, intended "the definition[] to evolve through a gradual process of judicial inclusion and exclusion." *Klem*, 295 P.3d at 1186. If anything, it would subvert the legislature's decision if courts were to *stop* policing unregulated practices.[6]

Nor does the mere possibility of future legislation absolve courts from this statutorily conferred duty. Unison (at 13-15) points out that last legislative session, the Washington legislature considered various proposals to regulate these kinds of products. Yet courts "are loath to ascribe any meaning to the Legislature's failure to pass a bill into law." *State v. Cronin*, 923 P.2d 694, 697 (Wash. 1996). Unison also (at 13) quotes legislative reports stating that such products "are not currently covered under

---

[6] Unison quotes *State v. Schwab*, 693 P.2d 108 (Wash. 1985), but the Washington Supreme Court has explained that *Schwab* involved a unique situation "where the legislature clearly did not intend for the CPA to apply" to the entire area of "landlord-tenant disputes," *Panag*, 204 P.3d at 898 n.12. In contrast, violations of the Consumer Loan Act's protections for homeowners are per se violations of the CPA, and thus an area where the legislature clearly wanted courts to apply the CPA. RCW § 31.04.208.

the Washington Consumer Loan Act." But legislative reports about legislation that never passed can't be used to determine the meaning of an existing statute.

And even if the Consumer Loan Act *didn't* apply, the CPA provides courts with "an efficient and effective method of filling the gaps in … statutes" to protect consumers while the slow process of lawmaking tries to catch up with the fast-moving, ever-evolving world of financial products. *Panag*, 204 P.3d at 898. After all, "[e]ven if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again." *Klem*, 295 P.3d at 1187. Whatever forward-looking protections the legislature may (or may not) ultimately adopt, the CPA tasks courts with protecting Washington residents who have already been harmed. And ruling in the Olsons' favor would have no effect on the legislature's ability to enact future laws. The only question is whether the Olsons will be left out in the cold, a judgment the legislature assigned to courts.

### D.    Unison's contract is unconscionable.

For similar reasons, the "manner in which the contract was entered," its one-sidedness, and the complex accounting tricks buried in "fine print," make it unconscionable and grossly unfair, which violates the CPA. *State v. Kaiser*, 254 P.3d 850, 859-60 (Wash. App. 2011).

Unison provided an elderly couple in financial distress with a modest lump sum in exchange for the company's expected dramatically higher repayment—far

more than Unison could legally obtain from a regular mortgage. *See* RCW §§ 19.52.020(1), 31.04.105(1). While investing in homes can be a very profitable investment over the medium term, rising home values come with significant associated costs: taxes, insurance, maintenance, and hefty seller's fees. Unison, however, gets homeowners in financial distress to cover those costs for decades. 1-ER-92-93 § 3.3(e), (f); 1-ER-99 § 7.1(c); 1-ER-103 § 8.2; 1-ER-112 § 8.16(a). At the same time, Unison takes various steps to ensure that it won't have to bear the costs of any loss in the home's value. *See supra* 5-8. That is a far cry from "sharing" in the value of the home. Unison Br. 7-9.

That's why Unison targets people like the Olsons. Homeowners who aren't in difficult financial straits wouldn't jeopardize their homes for pennies on the dollar. It's also why Unison doesn't ensure that homeowners receive independent counseling that could help them understand the high risks and complex math of this contract. Otherwise, homeowners might balk before joining the hundreds of others across the state who are trapped in these contracts. That's unconscionable.

## III.   Unison's marketing is deceptive and misleading.

To show a practice is deceptive, the Olsons "need not show that they—or anyone—were in fact deceived," only that "the unfair or deceptive act or practice had the *capacity* to deceive a substantial portion of the public." *Young v. Toyota Motor Sales, U.S.A.*, 472 P.3d 990, 994 (2020). "Nor is there a need to prove reliance." *Id.* at

994-95. Deceptiveness is determined by looking "not to the most sophisticated readers but rather to the least," and "a communication may contain accurate information yet be deceptive." *Panag*, 204 P.3d at 895-96. Drawing all reasonable inferences in the Olsons' favor, they amply satisfy that standard. The district court's single paragraph of analysis, relying on a boilerplate disclaimer, should be reversed.

### A. Unison's statements have been consistently identified as misleading and deceptive.

Unison's flyer included statements routinely identified as misleading.

*First*, despite Unison's assurances of "no monthly payments," 1-ER-28, the Olsons must make regular payments of various bills or lose their home, *see supra* 22. Unison (at 41) belittles the many elderly homeowners who have been misled by such assurances as "illogical." But as the Consumer Financial Protection Bureau has explained, "no monthly payments" is a "material misrepresentation" when "a reverse mortgagor must continue to make payments related to the home, such as payments for property taxes, insurance and home maintenance, in order to retain it." *American Advisors Group*, 2016 WL 8539273, ¶¶ 23–29 (Dec. 7, 2016); *see also Aegean Financial*, No. 2016-CFPB-0025 (Dec. 7, 2016), https://perma.cc/QGR4-FM28 (same).[7]

---

[7] Unison's only response (at 42 n.12) is puzzling: it appears to confuse these 2016 orders with a 2021 order involving different statements by a different company, then tries to distinguish it from this case.

Scholarship also describes how such claims consistently mislead seniors. *See, e.g.*, Mancini & Williamson, *Reversing Course*, 26 Elder L.J. at 102-03.[8] That's because Unison's contract doesn't leave homeowners' obligations where they were beforehand. A homeowner can face foreclosure if they miss insurance payments. 1-ER-99 § 7.1(c)(ix). And if a homeowner wants a cheaper policy as insurance premiums rise, Unison can stop them, force them further into debt, or foreclose their home. That's why these statements have a well-documented "*capacity* to deceive." *Young*, 472 P.3d at 994.

*Second*, Unison's statements that the product involves "NO ADDED DEBT," 1-ER-28, and is "**is not a loan**," 1-ER-82 § 6, are also misleading. The product is a reverse mortgage and residential mortgage loan. *See supra* 3-14. And the Olsons are certainly in "a state of being under obligation to pay or repay someone or something in return for something received." *Debt*, Merriam-Webster.

*Third*, the same goes for the "no interest" claim. 1-ER-28. Unison can forcibly make payments to maintain the property, which accrue interest at a double-digit rate. 1-ER-111, 113.

---

[8] Unison asserts that "the mailer only states that the homeowner will 'make no payments to us [i.e., Unison] until you sell.'" Unison Br. 42 (quoting 1-ER-28). But the flyer repeatedly states that there are "no monthly payments" without this qualifier. 1-ER-28.

*Finally*, Unison (at 39-40) claims in passing that the Olsons forfeited their arguments about monthly payments and interest. But below, the Olsons identified exactly those statements as "misleading and deceptive," 1-ER-42, 54, as Unison acknowledged, 1-ER-21. Further, because the Olsons' deceptive practices claim was "properly presented," they "can make any argument in support of that claim." *Williams*, 846 F.3d at 311.

## B. The Olsons sufficiently alleged that Unison's marketing statements caused harm.

Because the district court didn't address causation, this Court would normally "remand this case for the district court to address [causation] in the first instance." *Nw. Band of the Shoshone Nation v. Wooten*, 83 F.4th 1205, 1213 (9th Cir. 2023). In any event, the Olsons need "not show [they] relied on the deceptive act," only "that but for the defendant's unfair or deceptive act or practice the plaintiff's injury would not have occurred as a matter of fact." *Young*, 472 P.3d at 996. That standard is easily met.

Start with the injuries, which include fees, along with Unison's option and deed of trust. 1-ER-221-22. As a court explained in permitting fraud claims against Unison to proceed, homeowners are harmed by "forgo[ing] some right to their property by virtue of Unison's option to purchase [a majority] interest in their home." *Weingot v. Unison Agreement Corp.*, 2024 WL 1191106, at *6 (E.D.N.Y. 2024); *see also Ruiz Torres v. Mercer Canyons*, 835 F.3d 1125, 1135 (9th Cir. 2016) (CPA injuries include when a "plaintiff's property interest or money is diminished"). The elderly couple

have lost much of the equity they spent their lives building and cannot move to a safer neighborhood because selling their home will net them little to no money. 1-ER-221. These are harms, notwithstanding Unison's attempt to belittle the Olsons' situation as nothing more than "optionor's remorse." 1-ER-208.

Turning back to causation, Unison's flyer caused the Olsons to seek out Unison's product. Drawing "all reasonable inferences" in their favor, it's certainly "plausible" that the flyer's main claims about the benefits of Unison's product were a but-for cause of the Olsons being locked into this contract. *Boquist*, 32 F.4th at 773.[9]

## C. Unison's deceptive marketing can't be rescued by a boilerplate disclaimer.

Unison seeks refuge by pointing out that its lengthy contractual documents contained a boilerplate suggestion that the elderly couple consult their "family" or "advisors." But "fine print" or a generic "disclaimer [will] not cure [a] deceptive impression." *Panag*, 204 P.3d at 895-96; *see also Kaiser*, 254 P.3d at 860 (same when information was "buried … in the numerous documents signed by the property owner").

This disclaimer doesn't even correct Unison's misleading statements, it just suggests seeking advice. 1-ER-169. And it wasn't even on the flyer. *Id.* Unison offers

---

[9] Had the district court held that causation was insufficiently pleaded as a matter of fact, the Olsons could have amended their complaint. They didn't because the district court only reached deceptiveness. If this Court were to conclude that causation was insufficiently pleaded, the Olsons should have a chance to amend.

no Washington caselaw for the proposition that a boilerplate disclaimer in a contract immunizes misleading marketing. Instead, again, Unison cites inapposite out-of-state caselaw involving different claims with different standards. *See Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1163 (9th Cir. 2012) (California "fraudulent concealment" claim); *Lavis v. Reverse Mortg. Sols.*, 2018 WL 2171444, at *5 (S.D.W. Va. 2018) (West Virginia "unconscionable inducement" claim).

Finally, the legislature determined that before homeowners put their homes on the line, it's the company's duty to ensure that they received independent counseling. RCW § 31.04.515(10). That guides the deceptive practices analysis, as Unison's product poses the same kind of risks in the same area of public policy concern. *See Panag*, 204 P.3d at 897-99.

## IV. This appeal involves important and novel questions of state law.

While this Court can resolve this appeal under general principles of Washington law, the Olsons' claims meet the criteria for certification because "it is necessary to ascertain the local law of [Washington] state in order to dispose of [a] proceeding and the local law has not been clearly determined." RCW § 2.60.020.

**A.** The Olsons' per se claim involves interpreting RCW § 31.04.505(5), which neither the Washington "Supreme Court or state court of appeal[s]" have interpreted. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 69 F.4th 554, 570 (9th Cir. 2023). Contrary to Unison's argument, "[c]ertification is particularly appropriate to

decide [a] novel question of state statutory interpretation." *Ruelas v. Cnty. of Alameda*, 51 F.4th 1187, 1190 (9th Cir. 2022). The Olsons' unfair practices claim asks whether Unison's product is "in violation of public interest," *Klem*, 295 P.3d at 1187, and it is "prudent to certify" cases that "involve[] policy considerations," *Potter v. City of Lacey*, 46 F.4th 787, 792-93 (9th Cir. 2022). The same goes for the Olsons' deceptive practices claim, which targets common deceptive language. *See supra* 23-24.

These aren't just "novel state-law question[s]," they are "important" ones. *Yamashita v. LG Chem, Ltd.*, 48 F.4th 993, 1002-03 (9th Cir. 2022). This appeal will impact hundreds of Washington residents. 1-ER-223, 228-29. Moreover, Unison is bundling and securitizing these mortgages in offerings of up to $443 million. *Unison Eyes up to Three Home Equity RMBS in 2022*, International Financing Review, https://perma.cc/Z66W-CFCB. Unison also touts that approximately $20 trillion in untapped equity is in the hands of U.S. homeowners and ripe for extracting, bundling, and securitizing. *Thomas Sponholtz & Jim Riccitelli*, Lend Academy (2017). Nor is Unison the only company pushing "shared appreciation" products in Washington. *See, e.g.*, *The Smart Way To Access Home Equity*, Unlock, https://perma.cc/ZCA6-YSJV.

**B.** Contrary to Unison's claim (at 52), this Court routinely certifies cases notwithstanding the outcome below, even when no party asks for it. *See, e.g.*, *T-Mobile USA v. Selective Ins. Co. of Am.*, 908 F.3d 581, 588 n.6 (9th Cir. 2018) (certifying *sua sponte*

where plaintiff lost below); *Potter*, 46 F.4th at 791 (plaintiff lost below); *Yamashita*, 48 F.4th at 996 (same). Certification isn't just about the parties; it "helps build a cooperative judicial federalism" and serves important comity interests. *T-Mobile*, 908 F.3d at 587. This is why federal courts have "an obligation to consider whether novel state-law questions should be certified." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 294 F.3d 1085, 1086 (9th Cir. 2002). And the case on which Unison primarily relies involved a party seeking certification after having initially "moved th[e] case to federal court." *All. for Prop. Rts. & Fiscal Resp. v. City of Idaho Falls*, 742 F.3d 1100, 1109 (9th Cir. 2013). Here, the Olsons filed in state court and Unison removed. 1-ER-3.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler
Thomas Scott-Railton*
Gupta Wessler LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

Beth E. Terrell
Blythe H. Chandler
Elizabeth A. Adams

---

\* *Admitted in New York; practicing under direct supervision of members of the District of Columbia Bar under Rule 49(c)(8).*

TERRELL MARSHALL
LAW GROUP PLLC
936 N 34th Street
Suite 300
Seattle, WA 98103
(206) 319-5450
bterrell@terrellmarshall.com

JOSEPH W. MOORE
UMAR IBRAHIM GEBRIL
CASCADE LAW PLLC
2707 Colby Avenue
Suite 1420
Everett, WA 98201
(425) 998-8999
joseph@cascade.law

July 1, 2024                           *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32-1(a) because this brief contains 6,999 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

_/s/ Matthew W.H. Wessler_
Matthew W.H. Wessler

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2024, I electronically filed the foregoing brief with Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the CM/ECF system. All participants are registered for CM/ECF users and will be served by the CM/ECF system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler